169 So.2d 89

**STATE of Louisiana**

**v.**

**Otis JAMES.**

No. 46857.

June 8, 1964.

Dissenting Opinion June 11, 1964.

On Rehearing Nov. 9, 1964.

Rehearing Denied Dec. 14, 1964.

G. W. Gill, Sr., and George M. Leppert, New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Jim Garrison, Dist. Atty., Louise Korns, Asst. Dist. Atty., for appellee.

SANDERS, Justice.

This is a criminal proceeding. The state charged that the defendant, Otis James, had unlawfully possessed one morphine tablet, a narcotic drug. He was tried and convicted. The court sentenced him, as a second offender, to a total of ten years in the state penitentiary. He has appealed, relying upon twenty-nine bills of exception reserved in the trial court.

Initially, the defendant filed a motion to quash the Bill of Information on the ground that LSA–R.S. 40:961 et seq., the Uniform Narcotic Act, is unconstitutional. To the overruling of the Motion to Quash, the defendant reserved Bill of Exception No. 1.

In support of the motion, the defendant asserts that LSA–R.S. 15:85 does not authorize bail pending appeal for an offender who has received a sentence of five years or more in a felony case. Under LSA–R.S. 40:981, the minimum sentence for the illegal possession of narcotics is five years. Hence, such a narcotic offender is denied

bail pending appeal. The denial of bail, the defendant contends, is tantamount to harsh, cruel, and unusual punishment prohibited by the federal and state constitutions and renders the Uniform Narcotic Act unconstitutional.

The defendant also contends that the statute is unconstitutional on the additional ground that it makes narcotic addiction a criminal offense. He relies upon Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, in which the United States Supreme Court struck down the addiction provisions of the California statute.

■ The denial of bail pending appeal to a narcotic offender based upon the length of his sentence does not constitute either cruel or unusual punishment.[1] The restriction of such bail to felony offenders receiving a sentence of less than five years is a reasonable expression of legislative policy.

■ The defendant, in our opinion, has no standing to attack the constitutionality of the addiction provisions of the Narcotic Law. Since he has not been charged with addiction, he is not adversely affected by those provisions.[2]

The attack upon the constitutionality of the Uniform Narcotic Act must fail. We find no merit in Bill of Exception No. 1.

1. See State v. Green, 244 La. 80, 150 So. 2d 571; State v. Morgan, 238 La. 829, 116 So.2d 682; State v. Bellam, 225 La. 445, 73 So.2d 311; and State v. Thomas, 224 La. 431, 69 So.2d 738.

2. See State v. Rue, 236 La. 451, 107 So.2d 702. See, however, State ex rel. Blouin v. Walker, 244 La. 699, 154 So. 2d 368, upholding the constitutionality of the addiction provisions of the law.

Bill of Exception No. 2 has given us serious concern. It was reserved to the overruling by the trial judge of a motion to suppress the demonstrative evidence—a morphine tablet and narcotics equipment—alleged to have been unlawfully seized by the police in the defendant's residence without a search warrant.[3]

The evidence discloses that on June 19, 1961, about 11:15 a. m., Officers Duffy and Warner of the New Orleans Police Department parked their unmarked automobile on Camp Street to watch the James' residence at 2013 Camp Street. The officers knew that the defendant was a narcotic addict because of a previous arrest. Shortly after the surveillance began, James left his residence and walked along Camp Street toward its intersection with Jackson Avenue. The officers followed him in their car. When he reached the intersection, he turned left on Jackson Avenue, at which time the officers lost sight of him. When the police reached the intersection, they saw James in the front seat of an automobile, driven by another man. The vehicle was leaving the curb. It crossed Jackson Avenue in a U-turn. Intending to question James and his companion, the officers forced the automobile to the curb.

As Officer Duffy stepped from the police car, James stuffed a piece of cellophane, containing what appeared to be a white tablet, in his mouth and jumped from the automobile. He had some paper currency in his hand. Officer Duffy shouted, "Police! Stop!" But, James ran. The officers caught and subdued him. Apparently, he had swallowed the cellophane. The officers picked up approximately $50.00 in currency, scattered on the ground. Meanwhile, the driver of the automobile had driven away in the confusion. He was not apprehended.

Having informed James that he was under arrest, the officers drove him to his residence about two blocks away. Although James stated that the front door was open, they found it locked. The officers heard a sound inside the house as if someone were running. They broke open the door and entered the house. They found the defendant's wife in the bathroom.

They called for assistance to make a search of the house. Four other officers aided them in searching the small, "shotgun" house, occupied by the defendant and his wife. The officers made an intensive search of both the house and yard. They examined the cabinets, shelves, and furniture. One officer found a morphine tablet in a chest of drawers. Another officer found an eyedropper and a pacifier (narcotic equipment) in a kitchen cabinet.

3. The defendant also interposed objection to the evidence at the time of its later introduction.

James admitted the ownership of the narcotic equipment, but denied that the morphine tablet was his. He suggested that the tablet had been placed in the chest by his brother, who had been committed to the penitentiary.

The defendant asserts that the morphine tablet and equipment were the products of an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution and Article I, Section 7, of the LSA–Constitution. Hence, he contends that the evidence is inadmissible in this criminal prosecution under the rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

The Fourth Amendment of the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article I, Section 7 of the Louisiana Constitution contains language similar to that of the Fourth Amendment.[4]

The purpose of this historic provision is the protection of the right of privacy of the people in their homes and effects. It prohibits the arbitrary intrusion of the police into houses for unreasonable searches and seizures.

As a general rule, a search is unreasonable if it is not conducted under the authority of a search warrant. However, the rule is subject to the important exception that a search may be reasonably made as an incident of a lawful arrest.

In the present case, the police officers concede that they had no search warrant authorizing them to search the defendant's home. Hence, to justify the forcible intrusion into his residence, it must be established that the search was incident to a lawful arrest. Presented to us for resolution are two questions: Was the arrest lawful? If so, was the search of defendant's residence incidental to it?

We shall resolve these questions in the light of the following pronouncement of the United States Supreme Court in Ker v. California:[5]

"* * * The States are not thereby precluded from developing workable rules governing arrests, searches and

4. "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no such search or seizure shall be made except upon warrant therefor issued upon

probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."
5. 374 U.S. 23, 34, 83 S.Ct. 1623, 10 L.Ed. 2d 726, 738.

seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain."

LSA–R.S. 15:60, the statutory authority for arrest without a warrant in this state, provides:

"Any peace officer may, without a warrant, arrest a person:

"(1) For the commission of any felony or misdemeanor committed in his presence;

"(2) When such person has committed a felony although not in the presence of the officer;

"(3) When a felony in fact has been committed and he has reasonable cause to believe that such person has committed it;

"(4) When he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that such person has committed it;

"(5) When he has received positive information by written, telegraphic or other authoritative source that another officer holds a warrant for such arrest."

The state asserts that, at the time the officers arrested James, they had reasonable cause to believe that he was committing the offense of unlawful possession of narcotics, a felony.

◼ Reasonable cause to make an arrest without a warrant exists when the facts within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of average caution in the belief that a felony has been or is being committed.[6]

◼ The evidence discloses that the police officers knew the defendant was a drug addict from their prior contact with him. When the officers approached the automobile in which the defendant was seated, he quickly stuffed what appeared to be a white tablet in his mouth, jumped out of the automobile, holding paper currency, and ran, ignoring the call, "Police! Stop!"

From these facts, in our opinion, the officers had reasonable cause to believe that the defendant unlawfully possessed narcotics. Hence, the officers had the authority to arrest him without a warrant. We conclude that the arrest was lawful.

More difficult is the question of whether the search of the residence two blocks from

6. State v. Pickens, 245 La. 680, 160 So.2d 577; State v. Calascione, 243 La. 993, 149 So.2d 417; State v. Aias, 243 La. 945, 149 So.2d 400.

the arrest site is within the bounds of a search incident to the arrest.

■ The doctrine that a search without a warrant may be legally conducted if incident to a lawful arrest has long been recognized. It infringes no constitutional rights.[7] Such a search may, under appropriate circumstances, extend beyond the person of the one arrested to the place or premises where the arrest is made.[8]

The space boundaries of a search incident to an arrest have not been specifically defined. Doubtless, they depend, to some extent, upon the circumstances surrounding the arrest.

■ Generally, for fixed premises to fall within the bounds of a search incident to an arrest, the arrest must take place on the premises. This rule applies with special force to a private residence because of the strong policy of the law favoring the privacy and sanctity of the home.[9] We are of the view that a private residence wholly unconnected to the place where the arrest is made lies beyond the ambit of a search incident to the arrest.[10]

The state concedes that the residence searched was two blocks from the point of arrest. It argues, however, that the residence was within the bounds of incidental search because the defendant left the residence shortly before his arrest. We do not agree with this argument. The occasion for the arrest arose on the street two blocks from the residence, and the arrest was completed there. To adopt a search rule broad enough to embrace the residence in the instant case would largely dispense with the requirement of search warrants after an arrest has been made. The protection of the people in the security of their homes would be seriously impaired.

The state has cited several decisions of the lower federal courts in its endeavor to sustain the present search. We have reviewed these cases. Based, as they are, upon diverse circumstances, we find nothing in them to alter our view that the search was outside legal bounds.

■ Since the disputed items were obtained by an unreasonable search and seizure, they are not admissible in evidence in

7. State v. Cade, 244 La. 534, 153 So.2d 382; State v. Calascione, 243 La. 993, 149 So.2d 417; State v. Aias, 243 La. 945, 946, 149 So.2d 400; Ker v. California, 374 U.S. 23, 81 S.Ct. 1623, 10 L.Ed.2d 726.
8. State v. Calascione, 243 La. 993, 149 So. 2d 417; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

9. See, e. g., LSA–R.S. 40:972.
10. See Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; Papani v. United States, 9 Cir., 84 F.2d 160; United States v. Coffman, D.C., 50 F. Supp. 823; United States v. Fowler, D.C., 17 F.R.D. 499; Annotation, 4 L. Ed.2d 1982, 1986; 79 C.J.S. Searches and Seizures § 67d, pp. 843–844.

this criminal prosecution. Mapp v. Ohio, supra.

The inadmissible evidence constituted an important part of the evidence produced at the trial. We are of the opinion that its introduction requires this court to order a new trial. LSA–R.S. 15:557. We need not consider the remaining Bills of Exception.

For the reasons assigned, the conviction and sentence are reversed, and the case is remanded for a new trial.

HAMITER, J., dissents, being of the opinion that the assailed search was legally made following and as an incident to the lawful arrest.

SUMMERS, J., dissents and will assign reasons.

HAMLIN, J., dissents being of the view that the residence was within the bounds of incidental search in connection with the lawful arrest. See, State v. Aias, 243 La. 945, 149 So.2d 400; State v. Pickens, 245 La. 680, 160 So.2d 577.

SUMMERS, Justice (dissenting).

My view is in conflict with that of the majority on the question of whether the search of the residence in this case was incident to the arrest and was reasonable.

The evidence at issue, in order to be admissible, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. I agree with the majority that the arrest was lawful. I cannot agree, however, that the defendant's constitutional protection from unreasonable searches and seizures has been violated. For the search to be reasonable it must be an incident of the arrest which we have found to be lawful. In our consideration we are warranted in examining the facts surrounding the arrest to determine whether the method of entering the house two blocks away may offend the constitutional standards of reasonableness. U.S.Const. amends. IV & V; La.Const. of 1921, art. 1, § 7; Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

The information within the knowledge of the officers at the time they arrested James clearly furnished grounds for a reasonable belief on their part that the accused had committed and was committing the offense of illegal possession of narcotics. James was convicted of possession of narcotics in 1954. He had often been "handled" by the New Orleans Police in connection with narcotics. Just a week before, Officer Duffy had arrested James and his wife for possession of narcotics and had discovered a morphine pill in the car the couple was using. In other words, the arresting officers knew that James was a drug addict.

Furthermore, before the arrest, Officers Duffy and Warner, knowing that James used narcotics, began a surveillance of his house. They saw James come out of his

residence, walk a block or two and turn a corner. When they confronted him sitting in a car with a colored man, he recognized them and shoved a piece of cellophane, which appeared to contain a white tablet, into his mouth, jumped out of the car with a lot of bills clutched in his hand, and began to run. It was reasonable for the arresting officers to assume that James had been in the process of selling narcotics to the colored man in whose car he was sitting when he was interrupted by the untimely appearance of the police officers. The logical conclusion for the officers to reach, under these circumstances, was that there were narcotics in the house from which James had just emerged, two blocks away, apparently to make a sale to the colored man in the car. This—it seems clear to me—constitutes one transaction, making the search of that same house, which ensued immediately thereafter, an incident to the arrest. State v. Green, 244 La. 80, 150 So. 2d 571 (1963); State v. Calascione, 243 La. 993, 149 So.2d 417 (1963); State v. Aias, 243 La. 945, 946, 149 So.2d 400 (1963).

One of the historical reasons for permitting a search following a legal arrest is to avoid destruction of evidence. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409 (1925).

This authority is appropriate here. The colored man who was with James in the car when the police approached managed to escape while the police officers were chasing and subduing James. James was able to consume and thus destroy whatever narcotics he had on him when the officers closed in. The reasonable place for the officers to search under these circumstances was the house from which James had just emerged, a scant two blocks away. No appreciable interval of time or space separated the arrest and search; both were intimately connected parts of a continuous transaction.

Certainly, if James had managed to outrun the police officers long enough to reach his home two blocks away, and had been caught and arrested by the pursuing officers as he entered his dwelling, there would be no question about the constitutionality of the search. It would seem an affront to common sense to say that the officers could not search James' home from which he had emerged shortly before simply because they caught and arrested him two blocks away. Kelley v. United States, 61 F.2d 843 (8th Circ. 1932). James' house was in such reasonably close proximity to the place of arrest, and the arrest was in such close proximity in time to his leaving the house, and the search was in such close proximity in time to the arrest, and there existed such probable cause to believe that a search of his home would reveal evidence pertinent to the arrest for possession of narcotics, that the search and seizure herein must be

viewed as incident to the arrest and therefore authorized. State v. Cyr, 40 Wash.2d 840, 246 P.2d 480 (1952). The private residence here was not "wholly unconnected to the place where the arrest is made" as the majority finds. Rather, I find a very close, a very real and a very obvious connection with the cause of the arrest.

The practical demands of effective criminal investigation and law enforcement by the states are not reprobated by the Federal and State Constitutions. The majority decision places another unwarranted legal impediment in the path of already heavily burdened law enforcement. Cf. State v. Pickens, 245 La. 680, 160 So.2d 577 (1964); State v. Aias, 243 La. 945, 149 So.2d 400 (1963).

I respectfully dissent.

## ON REHEARING

HAMLIN, Justice.

A rehearing was granted in this matter in order that we might reconsider our finding with respect to Bill of Exceptions No. 2. On original hearing, this Court set aside the conviction and sentence of the defendant for the crime of wilfully and unlawfully possessing and having under his control a narcotic drug, to-wit, one morphine tablet, a crime prohibited by LSA–R.S. 40:962; the matter was remanded to the trial court for a new trial. The majority opinion[1] held that the trial court was in error in overruling defendant's motion to suppress demonstrative evidence (a morphine tablet and equipment), which alleges that all of the evidence in the possession of the State in this case was seized contrary to the Fourth and Fifth Amendments to the United States Constitution and Section 7 of Article I of the Constitution of the State of Louisiana, depriving defendant of equal protection of the law. This Court on original hearing held that the disputed items were obtained by an unreasonable search and seizure and were inadmissible in evidence in the instant criminal prosecution. Bill of Exceptions No. 2, taken to the overruling of the motion to suppress, was considered in the light of Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726.

A reconsideration of Bill of Exceptions No. 2 constrains us to conclude that it is without merit; because of our finding, we feel that it is necessary to quote the pertinent facts associated with the bill as stated on original hearing:

"* * * on June 19, 1961, about 11:15 a. m., Officers Duffy and Warner of the New Orleans Police Department parked their unmarked automobile on Camp Street to watch the James' residence at 2013 Camp Street. The officers knew that the defendant was a

---

1.  The author of this opinion on rehearing dissented on original hearing.

narcotic addict because of a previous arrest. Shortly after the surveillance began, James left his residence and walked along Camp Street toward its intersection with Jackson Avenue. The officers followed him in their car. When he reached the intersection, he turned left on Jackson Avenue, at which time the officers lost sight of him. When the police reached the intersection, they saw James in the front seat of an automobile, driven by another man. The vehicle was leaving the curb. It crossed Jackson Avenue in a U-turn. Intending to question James and his companion, the officers forced the automobile to the curb.

"As Officer Duffy stepped from the police car, James stuffed a piece of cellophane, containing what appeared to be a white tablet, in his mouth and jumped from the automobile. He had some paper currency in his hand. Officer Duffy shouted, 'Police! Stop!' But, James ran. The officers caught and subdued him. Apparently, he had swallowed the cellophane. The officers picked up approximately $50.00 in currency, scattered on the ground. Meanwhile, the driver of the automobile had driven away in the confusion. He was not apprehended.

"Having informed James that he was under arrest, the officers drove him to his residence about two blocks away.

Although James stated that the front door was open, they found it locked. The officers heard a sound inside the house as if someone were running. They broke open the door and entered the house. They found the defendant's wife in the bathroom.

"They called for assistance to make a search of the house. Four other officers aided them in searching the small, 'shotgun' house, occupied by the defendant and his wife. The officers made an intensive search of both the house and yard. They examined the cabinets, shelves, and furniture. One officer found a morphine tablet in a chest of drawers. Another officer found an eyedropper and a pacifier (narcotic equipment) in a kitchen cabinet. James admitted the ownership of the narcotic equipment, but denied that the morphine tablet was his. He suggested that the tablet had been placed in the chest by his brother, who had been committed to the penitentiary."

The State, on whose application this rehearing was granted, contends that the statement, "To adopt a search rule broad enough to embrace the residence in the instant case would largely dispense with the requirement of search warrants after an arrest has been made. The protection of the people in the security of their homes would be seriously impaired", is unrealistic. It argues that the search of James' residence was

a reasonable one incident to a lawful arrest, and that the evidence seized as a result of such search is legally admissible in evidence.

On original hearing, we properly found that the arresting officers had reasonable cause to believe that the defendant unlawfully possessed narcotics, and that, therefore, they had authority to arrest him without a warrant. We concluded that the arrest was lawful. (The defendant did not apply for a rehearing.)

Since the arrest was lawful, we have posed for our determination the question of whether the search and seizure were reasonable and incidental to arrest and were within the bounds of incidental arrest. We shall approach our determination in the light of Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081, which held that the Fourth Amendment's right of privacy is enforceable against the States through the Due Process Clause of the Fourteenth Amendment and is enforceable against them by the same sanction of exclusion as is used against the Federal Government.

"* * * Mapp, however, established no assumption by this Court of supervisory authority over state courts, * * * and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law. * * * Second, Mapp did not attempt the impossible task of laying down a 'fixed formula' for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures; it recognized that we would be 'met with "recurring questions of the reasonableness of searches"', and that, 'at any rate, "[r]easonableness is in the first instance for the [trial court] to determine,"' * * * thus indicating that the usual weight be given to findings of trial courts." Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726.

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. * * * Reasonableness is in the first instance for the District Court to determine. * * *" United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. See, State v. Aias, 243 La. 945, 149 So.2d 400.

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime, and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it

was committed, as well as weapons and other things to effect an escape from custody is not to be doubted. * * * The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned. Such searches and seizures naturally and usually appertain to and attend such arrests. But the right does not extend to other places. Frank Agnello's house was several blocks distant from Alba's house, where the arrest was made. When it was entered and searched, the conspiracy was ended and the defendants were under arrest and in custody elsewhere. That search cannot be sustained as an incident of the arrests. * * *" Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145, 148.[2]

"It is argued that the search and seizure was justified as incidental to a lawful arrest. Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or im-

plements used to commit the crime. * * * This right to search and seize without a search warrant extends to things under the accused's immediate control * * * and, to an extent depending on the circumstances of the case, to the place where he is arrested, * * *. The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime— things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. Agnello v. United States, supra, 269 U.S., at 31, 46 S.Ct. at 5, 70 L.Ed. 145. * * *" Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.[3]

2. We have carefully read the Agnello case, relied on by the defendant, and do not find it apposite. The premises searched, Agnello's and Pace's quarters, were not incidental to the place of arrest. The evidence secured at Alba's house where the arrest was made was held admissible.

3. The U. S. Supreme Court found the search to be unreasonable in the Preston Case because the car occupied by the accused at the time of arrest was not searched until after the men had been taken to the police station and booked. The Court held that the search was too remote in time or place to have been incidental to arrest.

In reviewing the evidence adduced herein in connection with Bill of Exceptions No. 2, we find that the arresting officers had the defendant's home under surveillance immediately prior to his arrest. They had reason to believe that the defendant was committing the crime of possessing narcotics; one of the arresting officers, Officer Thomas Duffy, had arrested him for the possession of narcotics eight days prior to the instant arrest; also, he had been convicted in 1954 for possession of narcotics.

In the instant case, the defendant left his home, travelled two blocks and met an apparent acquaintance; he sat in the car with the acquaintance until the police arrived. The officers had grounds to suspect that there was a relation between defendant's house and his meeting with the man who escaped. Immediately prior to the arrest, defendant bit Officer William Warner's finger when he was endeavoring to retrieve from defendant's mouth what he thought was a morphine tablet wrapped in cellophane. The defendant swallowed cellophane and tablet; no test could be made of the contents of his stomach. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183. Within minutes after a lawful arrest, the arresting officers and the defendant were back at the defendant's house, a distance of two blocks travelled by car.[4] Defendant did not object to the officers

entering his home; Officer Warner asked him for the key and he told the officer that a key was not needed as the door was open. Officer Warner had to force the door open, Cf. LSA–R.S. 15:46, but no resistance was offered by James. Other officers were called to assist in the ensuing search which revealed the controverted evidence.

We find no remoteness between the place of search and the place of arrest, nor between the time of arrest and the time of search and seizure. We find that there was a direct connection between the place of arrest and the place of search and seizure; such a substantial nexus between the arrest and the search and seizure existed, that they were a continuous transaction. People v. Aleria, 193 Cal.App.2d 352, 14 Cal. Rptr. 162, Certiorari denied, 374 U.S. 832, 83 S.Ct. 1876, 10 L.Ed.2d 1055. See, State v. Pickens, 245 La. 680, 160 So.2d 577. We find that the search and seizure were incident to a lawful arrest. State v. Aias, 243 La. 945, 149 So.2d 400. The search and seizure under the facts of this prosecution were within the bounds of incidental arrest; they were substantially contemporaneous. Preston v. United States, supra, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777. The evidence seized was under the defendant's control and could have been offered in evidence. Harris v. United States of

---

4. Defendant's wife testified that he was brought back to his home fifteen minutes after he left.

America, 331 U.S. 145, 67 S.Ct. 1098, 91 L. Ed. 1399. Cf. State v. Calascione, 243 La. 993, 149 So.2d 417. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; Anno: Search Incident to Arrest, 4 L.Ed. 2d 1982.

We find, as stated supra, that Bill of Exceptions No. 2 is without merit. Our finding on original hearing with respect to this bill is now set aside.

## BILLS OF EXCEPTIONS NOS. 3 AND 14.

Bills of Exceptions Nos. 3 and 14 shall be considered jointly. They were reserved to the trial judge's overruling certain objections advanced by counsel for the defendant to the State's opening statement.

During the course of the opening statement, the assistant district attorney said:

"* * * At approximately 2:00 P.M. Officer Justin Favalora, one of the officers who had arrived after the arrest, was searching one of the dressers in a room next to the kitchen, and he found four medicine droppers, three of these having a black rubber bulb on the same and he also found a small brown envelope containing a 25 calibre cartridge along with a piece of rubber finger stall with a rubber band in the same. This was found in a bottom drawer of the dresser. Again Officers will testify as to the use of all of these objects with the exception of the cartridge by narcotic addicts for the purpose of carrying narcotic drugs and injecting the same into their systems. Officer Favalora then pulled out the middle drawer and in the center of this drawer he found one white tablet. This was the only object in the drawer. Except for this white tablet, the drawer was empty. At this time Favalora called James over to the drawer and he showed him the small tablet. James replied, 'that must be an old one. Leslie is sending me to the Penitentiary.' He was asked what he meant by that and he said, 'My brother Leslie must have left it in the drawer, before he went to the Penitentiary a couple of years ago.' The evidence will show, as a matter of fact, that the defendant's brother Leslie had been in the Penitentiary for a period of several years. The evidence will also show however, that just one week previous officer Raymond Comstock of the Narcotic Squad had, with other officers, conducted a search of the very same premises occupied by Otis James, and that during the search conducted one week previous, Comstock had personally searched through the very dresser in the very drawer where the one tablet was found and that at that time there was nothing in the drawer.

"While the Officers were at the residence, several telephone calls were received from people asking for Otis James. On two of these particular calls, Officer Patrick Lampard answered the telephone, disguised his voice and held a short conversation with the person on the telephone after learning that the subject's name was Allen. Lampard recognized this person to be Alan Holmes, a person known to him to be an addict. Lampard arranged with Alan to sell him two morphine tablets for the price of five dollars each. The arrangement was made for the sale to take place at Camp and Jackson Avenue in approximately ten minutes from the time of the telephone call.

"Lampard did not identify himself as a police officer but merely someone who was in James's residence. In other words, Lampard made the arrangement, or obstensibly the arrangement was made for the sale to take place on the corner of Camp and Jackson in approximately ten minutes from the time of the telephone call. Officers Lampard and Verdi went to Camp between Jackson and Philip to see if the caller would come, and after about a five minute wait an individual that Lampard knew as Alan Holmes did appear to keep the appointment and he was placed under arrest and was taken back to the house.

"After completion of the search, James was then questioned by Officer Warner in Duffy's presence. He freely and voluntarily answered certain questions. He denied any knowledge of the tablet that was found and denied also that he knew Alan Holmes, and stated that he did have a narcotic habit.

\*     \*     \*     \*     \*     \*

"Did have a narcotic habit. He told the officers that he was using narcotics but that his veins were all 'burnt out', this was his words, 'burnt out from shooting', and again in his own words 'getting under the skin.' He then displayed and pointed out several marks on the hands and arms. The Officers inspected his hands and arms and other portions of the body and one or more of them will again be qualified as expert in the recognition of the type of marks left on the body of those injecting and using narcotic drugs. These officers will state that certain marks seen on the body of Otis James were what is known as 'track marks', that is, small puncture marks left by the use of narcotic paraphernalia. \*   \*   \*"

The objection to the above statement recites:

"Object to the statements made by the district attorney that reflect upon

the character of the defendant. There has been no evidence before the jury and the reference by the District Attorney about his being an addict, and the reference to his previous arrest and the search made, and the reference to his brother being in the penitentiary, all of which he stated in his opening statement is such to practically put this man in the penitentiary."

Counsel for the defendant contended that under the circumstances of the opening statement, the defendant could not proceed to trial and receive a fair and impartial trial; counsel objected to testimony which enlarged or explained the opening statement.

LSA–R.S. 15:333 sets forth the steps in a trial. It recites that the district attorney shall give an opening statement which explains the nature of the charge and the evidence by which he expects to establish the same.

LSA–R.S. 15:378 states:

"The prosecution has the right to rebut the evidence adduced by the defendant, but the defendant is without right to rebut the prosecution's rebuttal."

In State v. White, 244 La. 585, 153 So.2d 401, this Court held:

· "It is made the mandatory duty of the district attorney under Article No. 333 of the Code of Criminal Procedure (now R.S. 15:333) to make an opening statement to the jury 'explaining the nature of the charge and the evidence by which he expects to establish the same.' The very basic and fundamental object and purpose of such a statement to the jury is, as has been classically explained in cases and authorities on the subject too numerous to require citation, to so enlighten the jury with respect to the charge and the proof by which the state seeks to establish it beyond a reasonable doubt, it will 'enable the jury to understand and appreciate the testimony as it falls from the lips of the witnesses,' in order that the jury may be assisted in 'arriving at the truth.' State v. Sharbino, 194 La. 709, 194 So. 756. However, the scope and extent of such a statement must be controlled by the trial judge in the exercise of a wise and sound discretion, and his action in concluding what is and what is not proper is subject to review by this court in order that we may determine whether that discretion has been abused. [Authorities.]"

We have read the testimony of record attached to all bills of exceptions submitted for our consideration (all testimony of record is made part of Bills of Exceptions Nos. 3 and 14); we find that there is evidence which attempts to substantiate all declara-

tions made by the assistant district attorney in his opening statement. State v. Augustine, 241 La. 761, 131 So.2d 56, Certiorari denied, 368 U.S. 922, 82 S.Ct. 246, 7 L.Ed. 2d 137. There is also evidence of record showing that Officer Patrick Lampard testified to facts substantiating the opening statement. Officer William Warner testified at length with respect to his conversation with James at the time of the search and seizure concerning his use of narcotics; he also testified with respect to his observation of James' body.

■ Under the facts and circumstances shown by the testimony and evidence of record, we do not find that the trial judge abused his discretion in overruling the objections of counsel for the defendant to the opening statement of the assistant district attorney. The testimony of Officer Lampard fell within the ruling of State v. Di Vincenti, 232 La. 13, 93 So.2d 676; its purpose was to associate the defendant with the possession of narcotics. The testimony of Officer Warner also had for its purpose the connection of the defendant with the possession of narcotics. This testimony was neither compulsive nor self-incriminating. State v. Hughes, 244 La. 774, 154 So.2d 395; State v. Robinson, 221 La. 19, 58 So.2d 408.

Bills of Exceptions Nos. 3 and 14 are without merit.

## BILLS OF EXCEPTIONS NOS. 4, 5, 6, 7, 8, 9, 10, 11, 12 AND 13.

Bills of Exceptions Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 will be considered jointly; they all relate to the trial judge's refusal to give to the jury various special charges requested by counsel for the defendant.

Bill of Exceptions No. 4 was reserved to the refusal of the trial judge to give Special Charge No. 1, which recites:

"I further charge you that if you find from the evidence that the premises that were searched in which the alleged narcotic was purportedly found but that a search warrant was not obtained prior to the search and seizure, then I charge you that you must find the defendant not guilty."

Bill of Exceptions No. 5 was reserved to the refusal of the trial judge to give Special Charge No. 3, which recites:

"Defendant testifying or not testifying in own behalf—I charge you the defendant is permitted by law to testify in his own behalf. If he exercises this privilege, he is governed by the same rules, in testing his credibility, and the correctness of his statements, as every other witness. You have the right to believe or disbelieve him, just as he impresses you as to the truth or falsity of his testimony. When he does not avail himself of this privilege, you should not consider this fact, or

permit it to raise a presumption of guilt against him, and you should consider, in determining his guilt or innocence, only those facts testified to and brought out on the trial of the case."

Bill of Exceptions No. 6 was reserved to the trial judge's refusal to give Special Charge No. 4, which recites:

"I further charge you that the defendant is charged in bill of information with wilfully and unlawfully possessing narcotics.

"In that connection I charge you that the sacramental averments of the bill of information must be proved to your satisfaction and beyond a reasonable doubt.

"The mere finding of the alleged narcotic in or about the premises or property of the defendant or in the proximity of his presence is not sufficient of itself in law to warrant a conviction. Before the defendant can be held to account for the narcotic allegedly found in his possession, it must be shown to your satisfaction that he possessed narcotic in the sense that the word 'possession' is understood, and that he did possess it wilfully and unlawfully.

"In that connection, the word 'unlawfully' is understood to be possession not warranted or permitted by authority in law, and that it is an act which the law prohibits. However, before considering that he possessed it unlawfully, you must first consider whether or not he possessed it wilfully. Wilfully necessarily means knowingly, as one could not wilfully do a thing without doing that thing knowingly.

&ast; &ast; &ast; &ast; &ast; &ast;

"Every voluntary act of a human being is intentional, but generally speaking, a voluntary act becomes wilful in law only when it involves some degree of conscious wrong or evil purpose upon the part of the actor. * * *

"Therefore, before the defendant can be held accountable under the law for the narcotics that might have been found near or about his person, you must be convinced:

"First, that the narcotics was actually possessed by him and that he possessed it wilfully and unlawfully because a person might have possessed either actual or constructive of such narcotic without his knowing he possessed it or that it was actually found, and if you are convinced that the narcotic was actually found on or about him or his person, but there is a reasonable doubt inside of your mind that he knew that it was there, then your duty is to acquit the defendant as he cannot be found guilty in law unless he

had knowledge that the narcotic was where it was found, that it was in his possession and that he had wilful knowledge and he actually did possess it wilfully; otherwise it is your duty under the law to find him not guilty.

"Mere possession of itself without the state proving that the possession was wilful and unlawful, is not of itself sufficient to justify a conviction, and it is the duty of the state at all times to prove that which it alleges in the bill of information, and if the state fails to prove the guilt of the defendant beyond a reasonable doubt, then you must under the law give him the benefit of that doubt and find him not guilty."

Bill of Exceptions No. 7 was reserved to the refusal of the trial judge to give Special Charge No. 5, which recites:

"I further charge you that if you find from the evidence that there was flight on the part of the defendant, that this alone is not evidence of guilt, as a person who truly believes that he is about to be assaulted or otherwise illegally proceeded against, has a right to either flee or to protect himself in such means as the law provides to insure a person from assaultive acts on the part of another.

"It has been shown that there was no 'legal process' going on in this case, and defendant was not informed that an arrest was being effected. Therefore, he must regard the circumstances as he sees them, as is his right. If he sees assaultive acts in the form of the car being forced to the curb, a man not in uniform attacking him. He may, therefore, resist, flee, or do whatever he deems advisable to protect his person. * * *"

Bill of Exceptions No. 8 was reserved to the refusal of the trial judge to give Special Charge No. 6. This charge treats of the subject of arrest; because we have found on original hearing that the arrest herein was a legal arrest, we find no need for quoting the requested charge.

Bill of Exceptions No. 9 was reserved to the refusal of the trial judge to give Special Charge No. 7, which recites:

"I further charge you that, when considering the evidence in the jury room, that it would be unfair to the defendant to demand of him the same calm deliberation that you gentlemen are now capable of exercising, in considering his actions and pertinent facts in connection therewith, as one under such circumstances would naturally be under a certain mental stress that would prevent him or her from exercising the same calm deliberation and draw the same deliberate conclusions such as you are capable of exercising at this moment when no such stress and emotion is present or apparent.

"I therefore further charge you that in weighing the testimony, that you try, as far as practicable, to place yourself in the defendant's position both before and at the time of the alleged crime charged as it is only in this way that you can reasonably ascertain the state of mind of the defendant concerning his conduct and actions and his apprehension and belief of danger. You have the right to take into consideration the ability of the defendant to see and observe his proximity, his physical condition, size and ability and his demeanor and his age to determine his ability or lack of ability or capability to commit the crime charged."

Bill of Exceptions No. 10 was reserved to the refusal of the trial judge to give Special Charge No. 8, which recites:

"I further charge you that the following verdicts are the verdicts responsive under the law:

"1. Guilty as charged.

"2. Guilty of the attempted possession of narcotics as set forth in the bill of information.

"3. Guilty of being an addict.

"4. Not guilty."

Bill of Exceptions No. 11 was reserved to the refusal of the trial judge to give Special Charge No. 9, which recites:

"The jury may convict upon circumstantial as well as upon direct evidence, but only with great caution, and, assuming all to be proved that the evidence tends to prove, if there is any reasonable hypothesis, or rational conclusion, consistent with that proof, other than the guilt of accused, then the circumstantial evidence is insufficient to convict. The true test is, not whether circumstances proved produce as full conviction as the positive testimony of a single credible witness, but whether they produce moral conviction to the exclusion of every reasonable doubt."

Bill of Exceptions No. 12 was reserved to the refusal of the trial judge to give Special Charge No. 10, which recites:

"If you believe that any witness in the case either for the State or for the defense, has wilfully and deliberately testified to any material fact, for the purpose of deceiving you, then I charge you that you are justified in disregarding the entire testimony of such witness as proving nothing, and as unworthy of belief. You have the right to accept as true or reject as false, the testimony of any witness, according as you are impressed with his or her veracity."

Bill of Exceptions No. 13 was reserved to the refusal of the trial judge to give Special Charge No. 11, which recites:

"The bill of information in this case is a mere accusation or charge against

the defendant, and it is not evidence of the defendant's guilt, and, the fact of such charge being filed is of no weight and does not carry any presumption of guilt, and you must not be influenced by it in considering the case."

In State v. Hills, 241 La. 345, 129 So.2d 12, 34, we explicitly stated:

"* * * The Court's charge to the jury 'must cover every phase of the case supported by evidence, whether accepted as true or not by the trial judge.' * * * And from Marr's Criminal Jurisprudence of La. Vol. 2, pp. 1031 and 1028 respectively, '* * * When from the evidence the jury might reach a conclusion of fact favorable to accused, the judge should not limit his charge to his own conclusion upon such issue, but should give a special charge, if requested, on a theory favorable to accused;' and 'It is his duty to charge upon every phase of the case made by the evidence, and where evidence is offered to prove a certain state of facts, and it is claimed that they are proved, he should, if requested, charge what the law is as applicable to the facts claimed to be proved, whether he believes or attaches any importance to this evidence or not, since it belongs to the jury alone to determine the weight and credibility of the evidence. * * * ' "

The trial judge states in several of his per curiams that counsel for the defendant did not request a written charge. Cf. LSA–R.S. 15:389; State v. Eubanks, 240 La. 552, 124 So.2d 543. In his per curiam to Bill of Exceptions No. 5, the trial judge states that he delivered a stereotyped general charge, which was in writing. Apparently the general charge was not taken down and reduced to writing by the court reporter, as it is not in the record. The trial judge also states that he particularly covered the law with respect to "possession", "search and seizure", "arrest", and "flight" in his general charge. He felt that Special Charge No. 7 was argumentative and invaded the province of the jury. Special Charge No. 8, which requested the trial judge to instruct the jury as to certain enumerated verdicts which it could bring in, set forth one verdict which was not responsive, "Guilty of being an addict." State v. Robinson, 221 La. 19, 58 So.2d 408.

LSA–R.S. 15:390 provides that the trial judge must give every requested charge that is wholly correct and wholly pertinent, unless the matter contained in such charge had already been given, or unless such charge requires qualification, limitation or explanation. The trial judge's per curiams to the bills being considered under this discussion informs us that his general charge covered all matters set forth in the requested special charges.

"Bill of Exception No. 10 was taken to the refusal of the judge to grant two special charges requested by the defendant relative to the rule of circumstantial evidence. The judge, in his per curiam, states that he refused the charges for the reason that they were covered in his general charge. Inasmuch as the defendant did not have the general charge included in the record, we are bound by the Judge's statement in his per curiam that the requested special charges are covered by the general charge." State v. Burkhalter, 211 La. 342, 30 So.2d 112. See, State v. McAllister, 244 La. 42, 150 So. 2d 557.

We conclude that the trial judge was not required to give the requested special charges in view of the fact that he states that the matter contained therein was given in the general charge. State v. Bickham, 239 La. 1094, 121 So.2d 207.

Bills of Exceptions Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 are without merit.

## BILLS OF EXCEPTIONS NOS. 15, 16, 17, 18, 21 AND 22.

Bill of Exceptions No. 15 was reserved to the trial court's overruling defendant's objection to the introduction in evidence of a piece of a rubber finger stall and an eyedropper with a rubber pacifier secured to it with a rubber band; these objects were found by Officer Thomas Duffy in defendant's kitchen during the search following the arrest. This bill was also reserved to the trial court's overruling defendant's objection to certain testimony given by Officer Duffy concerning the interrogation of the defendant by Officer William Warner with respect to his use of narcotics.

Bill of Exceptions No. 16 was reserved to the trial court's permitting Officer Thomas Duffy to testify with respect to his conversation with the defendant concerning the morphine tablet. Officer Duffy testified that the defendant told him that the tablet must have belonged to his brother Leslie who was in the penitentiary.

Bill of Exceptions No. 17 was reserved to the trial court's overruling defendant's objection to the testimony of Officer Justin Favalora with respect to his conversation with the defendant concerning the morphine tablet. Officer Favalora stated:

"I asked Otis what about the pill we found, showed it to him, and he stated that his brother was trying to send him to the penitentiary. We asked him what he meant by that and he said that must have been Leslie's pill. I don't know anything about it."

Bill of Exceptions No. 18 was reserved to the trial court's overruling defendant's objection to the testimony of Officer William Warner with respect to his conversation with the defendant concerning his use of narcotics.

Bill of Exceptions No. 21 was reserved to the overruling of defendant's objection to the trial court's permitting Officer Dominick Verdi (called in by the arresting officers to assist in the search) to testify with respect to a search he had made of defendant's home eight days previous to the present search. The officer stated that at the time of the present search the house contained the same furniture as had been there when he made his previous search.

Bill of Exceptions No. 22 was reserved when the trial court permitted Officer Raymond Comstock to testify with respect to a search he had made of defendant's house eight days prior to the present search. The officer testified that he had searched the same drawer in which the present morphine tablet was found and that at that time the drawer was devoid of narcotics.

Defendant contended that the testimony adduced in connection with the bills being presently discussed was damaging and objectionable. He also contended that the reputation of his whole family was brought before the jury by placing before it the question of previous raids.

LSA–R.S. 15:441 provides:

"Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.

"Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible."

██ The physical evidence was properly introduced; its purpose was to connect the defendant with the equipment found in his home. State v. Gaines, 223 La. 711, 66 So.2d 618.

██ The testimony of Officers Duffy and Warner was admissible to show intent; it was relevant and material. It was corroborative of the alleged fact that defendant possessed a narcotic drug. State v. Birdsell, 232 La. 725, 95 So.2d 290; State v. Clark, 220 La. 946, 57 So.2d 904.

██ The testimony of the officers with respect to a previous search of the defendant's house and with respect to statements of the defendant to the effect that his brother Leslie was sending him to the penitentiary, was admissible to prove falsity. State v. Aspara, 113 La. 940, 37 So. 883.

"In a criminal proceeding, the trial judge has the discretion of determining what is and what is not relevant and material evidence; his ruling in this respect will not be disturbed in the absence of obvious error. * * *" State v. Brown, 242 La. 384, 136 So.2d 394; See, State v. Murphy, 234 La. 909, 102 So.2d 61, Certiorari Denied, 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed.2d 1373.

We find no abuse of discretion by the trial judge in admitting the controverted evidence. We find no abuse of discretion by the trial judge in admitting the testimony of Officers Duffy, Warner, Favalora, Verdi, and Comstock.

Bills of Exceptions Nos. 15, 16, 17, 18, 21 and 22 are without merit.

## BILL OF EXCEPTIONS NO. 19.

Bill of Exceptions No. 19 was reserved to the trial court's overruling defendant's objection to a certain question propounded by the court to Officer Warner. The facts associated with this bill are stated by the trial judge in his per curiam as follows:

"In the course of his testimony on direct evidence, Officer Warner, a witness for the State testified, that he was one of the arresting officers who later went to the home of Otis James, where the morphine tablet was found together with certain paraphernalia used by addicts.

"He also testified that a medicine dropper and bulb found in defendant's home was shown the defendant, who admitted the outfit was his and used by him in his addiction.

"The witness when asked if the bulb was the type ordinarily found on eye droppers, he replied that the bulb portion of the outfit, 'appeared to be a rubber pacifier.'

"Upon his qualification as one familiar with the manner in which addicts employed the paraphernalia to inject narcotics into their bodies, Warner testified as to use of the pacifier and the medicine dropper with the hypodermic needle.

"The witness also described the reason for the use of a pacifier as a bulb, rather than the bulb usually found on an eye dropper. He said that the pacifier is made of a harder rubber, and therefore, gives more pressure 'to push the blood back,' 'pressure to overcome the pressure of the blood in the vein.'

"On cross-examination, Warner stated that he had four children; that the pacifier was used to keep the children from crying, and, that during the course of his investigation he learned that the defendant had a young child.

"He was asked by defense counsel if that pacifier could be used for a child. To this question, the witness answered affirmatively.

"At this point the court made the following observation:

" 'Let's see if we know what you are talking about when you say pacifier. In the light of your four children do you have a medicine dropper or an apparatus of that kind for your children?'

"The witness answered by saying, 'No sir, I do not.'"

Counsel for the defendant contends that the court in asking the above question committed substantial error, and that the rights of the defendant were abused. Counsel argues that the contention of the court is in substance that a pacifier is a piece of narcotic paraphernalia, and that the question to the presiding officer was of character as to persuade the jury that only narcotic users would have such paraphernalia.

■ We find that the trial judge was endeavoring to clarify the testimony adduced so that it would be intelligible; under such conditions, he had a right to interrogate Officer Warner in the manner above set out. State v. Coffil, 222 La. 487, 62 So.2d 651; LSA–R.S. 15:384.

The rights of the defendant were not prejudiced by the question propounded to Officer Warner; LSA–R.S. 15:557; the trial judge did not commit reversible error.

Bill of Exceptions No. 19 is without merit.

## BILL OF EXCEPTIONS NO. 20.

■ Bill of Exceptions No. 20 was reserved to the trial court's overruling defendant's objection to certain testimony given by Officer Patrick Lampard with respect to an incoming telephone call to defendant's home during the time of search and seizure.

We do not find that the testimony of Officer Lampard was hearsay testimony as contended by counsel for the defendant; it was relevant and was offered for the purpose of associating the defendant with the possession of narcotics. State v. Di Vincenti, 232 La. 13, 93 So.2d 676.

Bill of Exceptions No. 20 is without merit.

## BILL OF EXCEPTIONS NO. 23.

Bill of Exceptions No. 23 was reserved to the trial court's overruling defendant's objection to the introduction in evidence of the objects seized at defendant's home at the time of the search and seizure.

The trial judge states in his per curiam that, "In each instance same were properly identified, connected with the defendant and relevant to the issues in the case." In view of the trial judge's statement and our findings on Bill of Exceptions No. 2, there is no need for further discussion.

Bill of Exceptions No. 23 is without merit.

## BILL OF EXCEPTIONS NO. 24.

■ Bill of Exceptions No. 24 was reserved to the refusal of the trial judge to grant counsel for the defendant a five minute recess at the time the State rested its case.

The trial judge states in his per curiam that at the time the request was made counsel did not assign any reason for the request, nor did the court know of any reason justifying the same.

Counsel does not state in the instant bill his reasons for the request. " * * * it is well settled that a bill of exception must state the grounds of objection or point out specifically the errors complained of in order that an opportunity may be given the trial judge to correct them, and that, if it is not sufficiently specific, it will not avail the party raising it. * * *" State v. Labat, 226 La. 201, 75 So.2d 333.

Counsel states in brief that he was surprised by the testimony adduced from various witnesses concerning the addiction of the defendant; that he needed a few minutes to obtain information to properly proceed with his defense.

In view of the facts associated with the taking of this bill, we do not find that the trial judge abused his discretion. We do not find that the defendant suffered any prejudice by the refusal of the trial judge to grant his counsel the five minute recess requested. LSA–R.S. 15:557.

Bill of Exceptions No. 24 is without merit.

## BILL OF EXCEPTIONS NO. 25.

Bill of Exceptions No. 25 was reserved to the refusal of the trial judge to grant a mistrial.

The trial judge's per curiam sets forth as follows the events associated with the motion for a mistrial:

"During the cross-examination of one Herbert K. Dempsey, a defense witness, he was asked by the State, 'Did you know James (defendant) to be a user of narcotics?' The witness replied 'I don't know.'

"At this point defendant objected and asked for a mistrial. The court sustained defendant's objection, but denied the motion for a mistrial. He then reserved this bill.

"While defendant on the trial did not give his reasons for the objection and his request for a mistrial, in his bill, defendant asserts, 'neither before nor subsequent to this question did your defendant in any way put his character at issue.'

"Prior to this objection the witness testified that he had known defendant and his family for 18 or 20 years, and had formerly roomed with defendant's family. He further stated that he had permitted defendant and his wife to occupy a room in his home free of charge some 8 or 10 days before this arrest; and, that defendant and his wife had the use of the bathroom. It was also his testimony that the eye-droppers identified by the police as having been found on the premises

were similar to those used by the witness. It was also his testimony that the dresser in which the police found the narcotic, and its several drawers were kept in use by him and were filled with his belongings. He also stated that a relative of his had occupied a cot in his room for several days, and that he had put him out because he did not like the looks of his relative's friends, who had used the bathroom for too long a period.

The jury did not believe this witness, nor did the court.

"The witness was under cross-examination. He could be examined upon the whole case. (LSA–R.S. 15:376.)

"Whether defendant was addicted to the use of narcotics was a relevant and material question, on a trial for the possession of narcotics.

"However, as the bill discloses, the witness answered the question, that he did not know if defendant was addicted to narcotics.

"Out of an abundance of caution, the court sustained the defendant's objection. The state did not pursue this line of questioning.

"As the court believed the question relevant, and the answer of the witness, did not prejuduce the defendant, the court refused to order a mistrial.

\*  \*  \*  \*  \*  \*

"It will be noted that while defendant objected and asked for a mistrial, he did not request the court to instruct the trial jury to disregard the import of the question."

In view of the fact that the witness Herbert K. Dempsey stated that he did not know the defendant James to be a user of narcotics, we find that the defendant suffered no prejudice. LSA–R.S. 15:-557; Cf. State v. Broussard, 202 La. 458, 12 So. 2d 218; State v. Scruggs, 165 La. 842, 116 So. 206. The trial judge was correct in overruling the motion for a mistrial.

Bill of Exceptions No. 25 is without merit.

BILL OF EXCEPTIONS NO. 26.

Bill of Exceptions No. 26 was reserved when the trial court overruled objections advanced by counsel for the defendant to certain testimony elicited from defendant's wife on cross-examination by the State.

The testimony had to do with Mrs. James' appreciation of her husband's situation at the time of the search and seizure; it also concerned her conversation with her husband when he was incarcerated at the Sixth District Precinct.

The formal bill gives no reasons for the objections advanced. No reasons were given for the objections at the time they were offered during trial. Under

these circumstances, this bill presents nothing for our consideration.

Bill of Exceptions No. 26 is without merit.

## BILL OF EXCEPTIONS NO. 27.

Bill of Exceptions No. 27 was reserved to the overruling of defendant's objection to the rebuttal testimony of Officer Justin Favalora.

Counsel for the defendant contended at the time of the objection that the matter to which the witness was testifying had been gone into on cross-examination. Officer Favalora was rebutting the testimony of defendant's witness Herbert Dempsey as to the contents of the chest of drawers in which the morphine tablet was found.

■■■■ Rebuttal testimony is that which is given to explain, repel, counteract, or disprove facts given in evidence by an adverse party. LSA–R.S. 15:378–379; State v. Poe, 214 La. 606, 38 So.2d 359. It was within the sound discretion of the trial judge to sustain or overrule counsel's objection. We find no abuse of discretion in the trial judge's ruling admitting the testimony which was strictly for the purpose of rebuttal.

Bill of Exceptions No. 27 is without merit.

## BILL OF EXCEPTIONS NO. 28.

Bill of Exceptions No. 28 was reserved to the trial court's overruling a motion to quash a bill of information filed against defendant as a multiple offender prior to sentence.

After the jury had rendered its verdict and a motion for a new trial had been denied, the State filed a bill of information against the defendant under LSA–R.S. 15:529.1, in which it charged that he was a double offender and urged that he should be sentenced as such. The State alleged that on August 31, 1954 the defendant was arraigned and pleaded guilty to violating LSA–R.S. 40:962 relative to the possession of narcotics; he was then sentenced to serve five years in the State Penitentiary. In the instant matter the defendant was sentenced to serve a term of ten years in the State Penitentiary.

Counsel for the defendant contended that there was no legal evidence upon which to predicate his conviction in the present prosecution, and that the statute under which he was convicted, LSA–R.S. 40:962, was unconstitutional.

On original hearing we disposed of Bill of Exceptions No. 1 (defendant did not ask for a rehearing) and ruled upon defendant's allegations with respect to the unconstitutionality of LSA–R.S. 40:962. Our rulings herein with respect to Bill of Exceptions No. 2 is dispositive of the defendant's contention with respect to the admissibility of the controverted evidence.

Bill of Exceptions No. 28 is without merit.

## BILL OF EXCEPTIONS NO. 29.

Bill of Exceptions No. 29 was reserved to the trial court's overruling defendant's motion for a new trial.

A number of the averments set forth in the motion for a new trial have been passed upon in our disposition of the foregoing bills of exceptions. The following averment, however, presents a charge that has not heretofore been considered:

"* * * The court will recall that it was only fifteen minutes between the retiring of the jury and the rendering of the verdict. It is respectfully suggested that the jury could not and did not in that length of time, give the accused the benefit of a fair and impartial trial and their verdict under such circumstances violated his constitutional rights and prerogatives as guaranteed him by both the state and federal constitutions. That counsel under the circumstances must come to the conclusion that someone, whether intentionally or unintentionally made known to the jury in the hallway or otherwise that the defendant had a long criminal record and that it is necessary that the jury be subpoenaed so that both counsel and this Honorable Court can inquire as to whether or not there was:

"1. Any tampering with the jury?

"2. Any intentional or unintentional statement made in their presence by anyone with reference to the criminal record of the defendant?

"3. To inquire as to whether the jurors or any one of them had learned from any source of the criminal record of the defendant, prior to their deliberations.

"That to this end, counsel respectfully requests that all of the members of the jury who returned the said verdict be subpoenaed on a date and hour convenient to this Honorable Court so that the above inquiry can be had."

In his per curiam to this bill, the trial judge states:

"At the hearing on the motion, the defendant summoned the 12 jurors who sat upon his case. Ten of their number responded. The following occurred:

"'Peter Bayer, a witness called by Mover, after first being duly sworn by the Minute Clerk, testified as follows:

"'* * * DIRECT EXAMINATION * * *

"'BY MR. GILL:

"'Q. Are you one of the gentlemen that was on the jury that rendered a verdict of guilty against this defendant?

" 'A.  I was.

" 'Q.  Please sir don't answer this question until his Honor rules.  The question is did you learn from any source of any degree or connection with this case whatsoever anything concerning the past criminal record of this defendant?

" '*BY THE A. D. AT. BRENER:*

" 'Object on the grounds the witness is not competent to answer.

" '*BY THE COURT:*

" 'Article 470 of the Code of Criminal Procedure states that a jury can not invalidate their verdict or finding of guilt, they can only defend their actions and not attack it, therefore the State's objection is sustained.

" '*BY MR. GILL:*

" 'To which if your Honor please respectfully object and reserve a bill of exceptions to the court's ruling and in addition with your Honor's approval and that of the State stipulate that if the same question would be asked of each other juror that would take the stand that the same objection would be made.

" '*BY THE COURT:*

" 'The same objection would be made and the same ruling and the same bill of exceptions would be reserved without the necessity of putting anyone of the others on the stand.'

"It will be observed that defendant did not claim that any of the supposed possibilities referred to in his motion, did in fact happen.  The possibility of some having occurred is simply asserted to explain the length of time needed by the trial jury to reach its verdict.  The strength of the State's case and the weakness of the defense, might, with equal certitude have brought about the result.

\* \* \* \* \* \*

"It is obvious defendant was engaged in a 'fishing' expedition.  His surmise as to the possibilities referred to in his motion are that and nothing more. To entitle him to a consideration of this phase of the motion he must have alleged with some degree of positiveness, that same did happen.  (L.S.A.–R.S. 15:507.)

"Assuming for the sake of argument, that information concerning defendant's 'long criminal record' did come to the attention of the trial jury, which is denied, the members thereof would be incompetent to give testimony concerning same.  (L.S.A.–R.S. 15:470.)"

▬▬▬  The shortness of time spent by a jury in deliberating on a verdict is not a ground for granting a new trial.  State v. Le Blanc, 116 La. 822, 41 So. 105; State

v. Nahoum, 172 La. 83, 133 So. 370; State v. Terrell, 175 La. 758, 144 So. 488, Certiorari Denied, 288 U.S. 589, 53 S.Ct. 386, 77 L.Ed. 968.

LSA–R.S. 15:470 provides:

"No juror, grand or petit, is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member; but every juror, grand or petit, is a competent witness to rebut any attack upon the regularity of the conduct or of the findings of the body of which he is or was a member."

▆ Under the provisions of the above statute, the trial judge was correct in not permitting the jurors to be interrogated with respect to their alleged acquisition of knowledge concerning the defendant's record.

Bill of Exceptions No. 29 is without merit.

For the reasons assigned, it is now ordered that the conviction and sentence of the defendant be affirmed. The right is granted to defendant to apply for a rehearing.

FOURNET, C. J., dissents being of the opinion our opinion on original hearing is correct.

McCALEB, J., dissents as to the ruling on Bill No. 2 being of the view that our original opinion is correct.

SANDERS, J., dissents and will assign written reasons.

SANDERS, Justice (dissenting).

We have before us a narcotic addict convicted of possessing a morphine tablet and sentenced to ten years in the penitentiary, as a multiple offender. Blighted as his life is, his personal cause evokes no ardent support. The constitutional question that he raises, however, is of grave import to all citizens. At issue is the security of the home.

The essential facts may be restated briefly: The defendant, James, left his home at 2013 Camp Street on the morning of June 19, 1961. Two officers of the New Orleans Police Department followed him. At that time, they intended only to observe his movements. They had no cause to arrest him. The officers lost sight of him after he turned on Jackson Avenue. When they again saw him, he was in a moving automobile with another man. Intending to question him, they forced the automobile to the curb. When he swallowed what appeared to be a white tablet and ran, the officers arrested him. The point of arrest was more than two blocks from and out of sight of the James' home. The officers returned him to his home, broke in the front

door, and entered without a search warrant. Six officers intensively searched the house and its contents for several hours. During the wall-to-wall rummage, they found, in a chest of drawers, the morphine tablet on which this prosecution is based.

For impelling reasons, perhaps too briefly stated in the original opinion, I hold that the intrusion into the James' home without a search warrant violated his rights under the federal and state constitutions.

The Fourth Amendment [1] and the specific mandate of the Louisiana Constitution [2] guarantee immunity from unreasonable searches and seizures by the police. The right protected is that of privacy, which has been described as "one of the unique values of our civilization." [3] The keystone of protection is the search warrant, which requires judicial endorsement of the need to invade private premises.

In Mapp v. Ohio,[4] the Supreme Court of the United States held that evidence obtained by unlawful searches and seizures was inadmissible in state criminal prosecutions. The Mapp decision established no uniform code of search and seizure for the states. Hence, the state rules of search and seizure need not be identical with those followed in the federal courts. A state, however, cannot fall below the standard of the Fourth Amendment in fashioning these rules. The constitutional standard of reasonableness is the same in federal and state courts.[5]

As early as 1914, the United States Supreme Court recognized the right of law enforcement officers to search the person arrested.[6] Such a right arises from the necessity of protecting the arresting officers, preventing the escape of the prisoner, and safeguarding the fruits and implements of the crime. The practice may have been a surviving incident of the ancient hue and cry in Anglo-Saxon law.[7] The expansion of this doctrine from a search of the person

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

2. Art. I, Sect. 7: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no such search or seizure shall be made except upon warrant therefor issued upon probable cause, supported by

oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

3. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153.

4. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

5. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; and Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726.

6. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

7. People v. Chiagles, 237 N.Y. 193, 142 N.E. 583, 32 A.L.R. 676.

arrested to a search of the person and the place of arrest can be traced in the decisions.[8]

The decisions of the United States Supreme Court have limited the incidental search of a private residence to those instances in which the arrest is made on the premises. In Weeks v. United States,[9] the Court condemned a search of the defendant's room without a warrant after he was arrested at his place of employment. Silverthorne Lumber Company v. United States [10] likewise condemned a search of the defendant's office after his arrest at home. In Agnello v. United States,[11] the officers arrested the defendant, Frank Agnello, in the residence of a co-defendant for a sale of narcotics there and searched Agnello's residence "several" [12] blocks away, from which he had emerged shortly before the narcotics sale and arrest. The Court rejected the government's contention that the search was incidental to the arrest because the building was in the immediate vicinity and formed part of the scene of the crime, stating:

"While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, *except as an incident to a lawful arrest therein*. Boyd v. United States, 116 U.S. 616, 624, et seq., 630, 6 S.Ct. 524, 29 L.Ed. 746; Weeks v. United States, supra, 393; Silverthorne Lumber Co. v. United States, supra, 391; Gouled v. United States, 255 U.S. 298, 308, 41 S.Ct. 261, 65 L.Ed. 647. The protection of the Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws." (Italics mine). 46 S.Ct. at 6.

The Court adheres to its position in the Agnello case, having cited it with approval in its two recent decisions on search and seizure. See Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 and Pres-

8. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Reynard, Freedom From Unreasonable Search and Seizure—A Second Class Constitutional Right?, 25 Indiana Law Journal 259; Way, Increasing Scope of Search Incident to Arrest, 1959 Washington University Law Quarterly 261; Macy, Search and Seizure Incident to Lawful Arrest, 10 Louisiana Law Review 546.

9. 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

10. 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.

11. 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145.

12. Fixed at three blocks by one commentator. See 10 La.Law Review 546, 548.

ton v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.

The best reasoned decisions of the lower federal courts sustain the view that a search of a private dwelling without a search warrant, following an arrest away from the premises, violates constitutional guarantees.

In Page v. United States, 282 F.2d 807, the officers arrested the defendant in front of his dwelling house after he emerged from it and started to enter a taxicab. They then searched the house and found a sawed-off shotgun, which gave rise to the prosecution. The Eighth Circuit Court of Appeals held that the search was outside the bounds of an incidental search.

In Papani v. United States, 9 Cir., 84 F.2d 160, a government investigator had a private residence under surveillance. The subject left the residence with untaxed alcohol in his automobile. He was followed and arrested at a considerable distance from the residence. The officers then returned to the residence and searched it. In holding the search unlawful, the Court stated:

"Summarizing the above rules, it would seem that a search is not incidental to the arrest, unless the search is made at the place of arrest, contemporaneously with the arrest."

In Drayton v. United States, 5 Cir., 205 F.2d 35, the officers arrested the defendant in a downstairs bedroom of a rooming house and searched a closed room on the second floor. In reversing the conviction, the Court stated:

"In Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, the Supreme Court approved a search, without a warrant, but incidental to a lawful arrest, extending throughout a four-room apartment consisting of a living room, bedroom, bathroom and kitchen, all under the control of the defendant who was arrested in the living room.

"The search here involved transcends even the doctrine of the Harris case, which appears to be the apogee of the Supreme Court decisions on search of a dwelling without a warrant. In the Harris case the other rooms of the apartment were open, readily accessible, and contiguous to the situs of the arrest. Here, room No. 5, in which the contraband was found, was wholly unconnected with the room in which the arrest was made. It was on another floor, and in another part of the building. To reach it from the room where the arrest was made, it was necessary for the officers to go through the downstairs hall, up the stairway to the second floor, and down that hall until room No. 5 was reached. It was then necessary to unlock No. 5 with the key which the officers had demanded that the defendant produce, and which the defendant yielded involuntarily.

"To sanction this search, even as an incident to a lawful arrest, would extend the doctrine of the Harris case too far. We have been directed to no authoritative case holding such a search reasonable." 205 F.2d at 37.

In United States v. Scott, D.C., 149 F. Supp. 837, the officers arrested the defendant on the street near his apartment. They then brought him to the apartment and searched it. In condemning the search, Judge Youngdahl declared:

"Though it is clear that a search of the defendant's apartment without a warrant would have been lawful had he been arrested there, United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, the mere fact that a suspect has been arrested elsewhere does not give rise to the right to search his apartment, Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. Nor can a seizure which would not be legal except as 'incident to an arrest' be made legal by returning a person already under arrest to his apartment prior to taking him to a police station. Cf. McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977. That the distance which the defendant was returned is not great in this case seems irrelevant. The Court is not inclined to prescribe an area of yards or blocks surrounding a man's home, and state that he may be arrested anywhere within that area and returned home for the purpose of permitting a search without a warrant." 149 F. Supp. at 840.

In United States v. Coffman, D.C., 50 F. Supp. 823, the officers arrested the defendant on his ranch about a quarter of a mile from his ranch house. In condemning the search of the dwelling without a warrant, the Court stated:

"A search at a location distant from the place of arrest, after the arrest has been completed, and where the entry of the place is not made prior to, or at the time of the arrest, but after, is illegal.

"* * * In language of unmistakable clarity, the Courts have thus spoken to federal law enforcement officers and admonished them that searches of one's premises, without a warrant, after an arrest is completed, are violative of the right guaranteed by the Fourth Amendment to the Constitution of the United States. The facts here, which are beyond dispute, show a direct violation of this right. The purpose of the entry of the house, over the objection of the defendant, could not have been 'to make an arrest', for the arrest had already been made and the defendant was in the custody of the officers, a quarter of a mile from the dwelling house." 50 F.Supp. at 825.

See also United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Carlo v. United States, 2 Cir., 286 F.2d 841; United States v. Garnes, 2 Cir., 258 F.2d 530; McKnight v. United States, 87 U.S. App.D.C. 151, 183 F.2d 977; United States v. Steck, 3 Cir., 19 F.2d 161; Poulos v. United States, 6 Cir., 8 F.2d 120; United States v. Fowler, 9 Cir., 17 F.R.D. 499; United States v. Hamm, D.C., 163 F.Supp. 4; United States v. Alberti, D.C., 120 F. Supp. 171; United States v. Johnson, D.C., 113 F.Supp. 359; Machen, The Law of Search and Seizure (1950), § 13, p. 72; and Paulsen, Safeguards in the Law of Search and Seizure, 52 Northwestern University Law Review 65, 67.

The great weight of state authority likewise supports the rule that a search of a private residence can be made only as an incident to an arrest on the premises. When the arrest is made elsewhere, a search of a private residence without a warrant violates constitutional rights. See Fowler v. State, 114 Tex.Cr.R. 645, 22 S.W. 2d 935; Warwick v. State, 104 Fla. 393, 140 So. 219; Riddle v. State, 73 Okl.Cr. 419, 121 P.2d 1014; Wallace v. State, 42 Okl.Cr. 143, 275 P. 354; People v. Heidman, 11 Ill.2d 501, 144 N.E.2d 580; People v. King, 60 Cal.2d 308, 32 Cal.Rptr. 825, 384 P.2d 153; Castaneda v. Superior Court, 58 Cal.2d 439, 30 Cal.Rptr. 1, 380 P.2d 641; Tomkins v. Superior Court, 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113; Hernandez v. Superior Court, 143 Cal.App.2d 313, 299 P.2d 678; People v. Gorg, 45 Cal.2d 776, 291 P.2d 469; 47 Am.Jur., Searches and Seizures, § 19, p. 515; 79 C.J.S. Searches and Seizures § 67, pp. 843–844; and Machen, The Law of Search and Seizure (1950), § 13, pp. 72–73.

In Fowler v. State, supra, the officers arrested the defendant adjacent to his residence, which had a separate bathroom. They searched the closed bathroom, located several yards from the point of arrest. In holding the search unlawful, the Texas court described the following principle as well settled:

"If the arrest is made outside the home or rooming place of the arrested party the officer has no right to go to the place where he resides and make a search for incriminating evidence."

In the Hernandez case, supra, the officers made the arrest on the public street near the residence. In rejecting the evidence obtained in the house-search, the California court stated:

"In the present case the search of the home of petitioner and Taverez was not an incident to Taverez' arrest. He was in his automobile on a public street when the arrest was made, and when he was there taken into custody his arrest was completed. The fact that it turned out that Taverez' home was but 95 feet away from the place of his arrest does not change the com-

plexion of this matter. His arrest was on a public street, not upon any part of the premises in which the apartment in which he lived was situated; and if we were to uphold a search of his home without a warrant because his home was but 95 feet from the place on the public street where he was arrested, we would necessarily have to uphold it if it were 95 blocks distant.

"Inasmuch as the officers did not have the right to enter and search the home of Taverez, their arrest of him certainly cannot justify the search of petitioner's home." 299 P.2d at 681.

Insofar as I can determine, only two states, Illinois and Delaware, have codified the law of incidental search. The statute of neither state permits the search of the interior of a residence when the arrest is made elsewhere than on the premises. The Delaware statute authorizes the search only when "The arrest is made on the premises * * *." Title 11, § 2303, Delaware Code Annotated. Adopted in 1963, the Illinois Code of Criminal Procedure fixes the scope of the arrest-search as "the area within such person's immediate presence * * *." S.H.A. Ch. 38, § 108–1.

Aside from cases supporting general principles of search and seizure, the majority relies chiefly upon the decision of the California Court of Appeal in People v. Aleria, 193 Cal.App.2d 352, 14 Cal.Rptr. 162. In that case, the police arrested the defendant, who was under the influence of narcotics, in the hotel lobby. They took the room key, which he held in his hand, and returned him to his room, up one flight of stairs and 20 to 30 feet down the hall. After the defendant invited them to search, the officers found narcotics. These facts differ materially from those in the present case, and the decision may be distinguished on that ground. The decision, however, has been criticized as diverging from the federal standard and tending to abolish search warrants. See Manwaring, California and The Fourth Amendment, 16 Stanford Law Review 318, 336, 343.

To this point, I have emphasized only the rule applied: A private dwelling may not be constitutionally searched without a warrant as an incident of an arrest made elsewhere. I have deferred an examination, of the basis for the rule. The rule may be explained, of course, by simply stating that the "place of arrest," as used in the decisions, means only the area immediately surrounding the prisoner as he stands when arrested. The real basis, however, is more than semantics. The jurisprudence suggests at least two reasons, intimately connected with the nature of the protected right and historical development of the incidental search, to support the rule.

The first of these reasons is common to all searches incidental to arrest. As we

have observed, the arrest-search is rooted in necessity, that of seizing the weapons that might be used to assault an officer and preventing the destruction or loss of the fruits and implements of the crime. Desperation born of arrest is sometimes heedless of the strength of the law. The drawing of a revolver or the casting aside of narcotics may thwart the law enforcement effort at the time of the arrest. The danger-area is that immediately surrounding the prisoner. This critical area fixes the scope of the search incidental to the arrest. The same necessity that creates the search also limits its extent. From this practical viewpoint, the area of overriding necessity does not include the interior of a residence at any substantial distance from the point of arrest. When, as here, a person is brought into secure custody by arrest on a public street, the search area, even when liberally drawn, does not embrace a residence two blocks away.

The second reason underlying the rule is peculiar to the premises-search. Under appropriate circumstances, the entry of

premises to make an arrest is authorized. When officers enter premises to make an arrest, the privacy is incidentally, but lawfully, breached by their presence. Once the privacy has thus been lawfully broken, a search of reasonable scope, concurrent with the arrest, may be made as a necessary projection of the search of the person arrested.[13] This legal base, of course, does not support the search of a dwelling when the entry is made, not to make an arrest, but to search following an arrest elsewhere.

The arrest-on-the-premises rule has much to commend it from the standpoint of police administration. Law enforcement officers need workable standards. They need to know in advance the extent of their authority. While no search rule has absolute precision, the requirement that the arrest be made on the premises is reasonably clear and concrete. In contrast, the "time-distance rule" adopted by the majority creates much uncertainty for the law enforcement officer, who must make prompt decisions as to his authority. How far from

---

13. Harris v. United States, 331 U.S. 145, 153, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399, 1407 ("Here the agents entered the apartment under the authority of lawful warrants of arrest."); United States v. Rabinowitz, 339 U.S. 56, 58, 70 S.Ct. 430, 431, 94 L.Ed. 653, 656 ("Armed with this valid warrant of arrest, the Government officers * * * went to respondent's place of business, a one-room office open to the public."); People v. Loria, 10 N.Y. .2d 368, 223 N.Y.S.2d 462, 179 N.E.2d 478, 482 ("Thus, if the search follows a lawful entry to effect an arrest, then it is valid * * *"). See also Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (majority and dissenting opinions); Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (dissenting opinion); United States v. Coffman, D.C., 50 F.Supp. 823; and People v. Conway, 225 Mich. 152, 195 N.W. 679.

the residence can an arrest be made without loss of the rights of incidental search? What is the maximum time interval between the arrest and search? These questions only illustrate the desirability of a more specific rule for law enforcement. A case-by-case approach to these questions does not assist the law enforcement officer now.

The search of a home without a warrant is banned notwithstanding probable cause to believe that it contains contraband or other seizable articles.[14] Such a search, moreover, is not validated by what it brings to light.[15] The traditions of time immemorial sustain this firm constitutional policy protecting the privacy of the home.[16] Additionally, full practical support for it is found in the fact that a house is immovable. Unlike an automobile, it cannot be moved from place to place, thereby defeating search warrant procedures.

The foregoing principles are particularly applicable in Louisiana. LSA–R.S. 15:68 authorizes arresting officers to "take from the person arrested, all offensive weapons or incriminating articles which he may have *about his person* \* \* \*." LSA–R.S. 15:72 authorizes arresting officers to enter a house "to make an arrest." The statute, of course, does not apply if the arrest has already been made. Moreover, the Narcotics Law, LSA–R.S. 40:972, has announced a strong public policy against the invasion of a private residence without a warrant to search for narcotics. It provides:

"\* \* \* no house, room or apartment used as, or which apparently is, a bona fide residence, shall be subject to invasion and search, except by an officer designated in a search warrant issued by a competent court having the powers of a committing magistrate, upon the filing in said court of an affidavit by two reliable persons reciting that they have reasons to believe and do believe that said place of residence is being used as a cloak or cover for a violation of the provisions of this Sub-part, and setting forth the specific violation being committed therein, together with such additional corroborating evidence as the court may, in its discretion, require to establish the probable existence of the alleged violation of this Sub-part.

14. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828; Davis v. State, 113 Tex.Cr.R. 421, 21 S.W.2d 509.

15. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; United States v. DiRe, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520; People v. Brown, 45 Cal.2d 640, 290 P. 2d 528; People v. Loria, 10 N.Y.2d 368, 223 N.Y.S.2d 462, 179 N.E.2d 478.

16. Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937), p. 123.

Such warrant shall be directed to a duly authorized peace officer and the premises described in the warrant shall be searched and all narcotic drugs, containers, bottles, etc., or any property used or designed or intended to be used in the keeping for sale, or sale, of narcotic drugs on said premises, shall be seized by such officer and the keeper of such place, or the person to whom such narcotic drug or property belongs, shall be apprehended and brought before the court issuing the warrant, to abide the further orders of the court. The officer to whom the search warrant is directed shall make proper return thereon of the action taken thereunder, describing the narcotic drugs or property seized, if any; and any narcotic drugs or property so seized shall be held by such officer, without right of having the same released upon writ or claim.

"The court shall preserve in its records, subject to inspection at any time by the public, the affidavits hereinabove referred to. If it should appear that the person or persons making said affidavit did so maliciously or without probable cause, and any house, room or apartment used as bona fide residence is searched by reason of the issuance of a search warrant based upon said affidavit, affiant or affiants making said affidavit shall be fined not more than five hundred dollars or imprisoned for not less than ten days nor more than sixty days, or both."

In our recent decision in State v. Calascione, 243 La. 993, 149 So.2d 417 (1963), we recognized this strong statutory policy and sustained the search for narcotics solely on the ground that the officers arrested the defendant in his residence after observing him make a sale of narcotics there. Quoting from United States v. Rabinowitz, we stated:

"* * * It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant." 243 La. at 999, 149 So.2d at 419.

The prosecution has urged this Court to adopt a liberal search rule because this state has been "forced to adopt the exclusionary doctrine" by the decision of the United States Supreme Court in Mapp v. Ohio. Although this plea has been adroitly presented, I find no merit in it.

The Mapp decision did not reduce the search authority of state law enforcement officers. Such searches as the one in the present case were violative of constitutional

■■■■■■

rights before Mapp.[17] The decision did add a sanction: It made the evidence from unconstitutional searches inadmissible in state criminal proceedings. At the time of the decision, over half the states had already adopted the exclusionary rule.[18] While this Court had rejected the exclusionary rule, it at one time had been divided on the question.[19]

The main defect in the state's argument, however, is that it confuses the exclusionary

sanction, as to the worth of which there may be a divergence of view, with the substantive restriction against the invasion of private homes without a search warrant, which forms a sacred feature of our American heritage. Curtailing the substantive restriction not only renders Mapp v. Ohio an exercise in legal futility, but also impairs the protection of the right of privacy of all the homes in our state—those of both the just and unjust.

I respectfully dissent.

17. Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782; Art. I, Sect. 7, Louisiana Constitution.

18. See Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081; Elkins v.

United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (Appendix).

19. See State v. Shotts, 207 La. 898, 22 So. 2d 209; State v. Alvarez, 182 La. 908, 162 So. 725; and State v. Eddins, 161 La. 240, 108 So. 468.