SANDERS, Justice.
The defendant Ti'oy Bland Cade, is the leader or minister of a religious sect known as Islam in the City of Monroe, Louisiana. The sect is composed of negroes, who style themselves Muslims. He was indicted for criminal anarchy, a violation of LSA-R.S. 14:115. After the overruling by the trial judge of a motion to quash the indictment and a motion to suppress evidence, the defendant was tried and adjudged guilty. The trial judge sentenced him to a term of six years in the Louisiana State Penitentiary. The defendant has appealed his conviction, relying upon fourteen Bills of Exception resexwed during the course of the trial.
LSA-R.S. 14:115, upon which this prosecution is based, px-ovides:
“Criminal anarchy is:
“(1) The advocating or teaching, in any manner, in public or private, of the subversion, opposition, or destruction of the government of the United States or of the State of Louisiana by violence or other unlawfxtl means; or
“(2) The organizing or becoming a member of any organization or society which is known to the offender to advocate, teach, or practice the subversion, opposition, or destruction of the government of the United States or of the State of Louisiana by violence or other unlawful means.”
The Bill of Indictment charges the defendant in the following language:
*539 “ * * * that Troy Bland Cade late of the Parish aforesaid, in the Fourth Judicial District of the State of Louisiana, beginning on or about the 1st day of the month of July Anno Domini, nineteen hundred and fifty-nine and continuously since that date, in the Parish, District and State aforesaid, did then and there wilfully and feloniously: violate Article 115 of Title 14 of the Revised Statutes of the State of Louisiana, a criminal offense entitled ‘Criminal Anarchy’, in that the said Troy Bland Cade (1) did teach and advocate, in public and in private, opposition and destruction of the government of the United States and of the State of Louisiana by violence or other unlawful means, and (2) by becoming and remaining a member of an organization or society which he knew advocated, taught and practiced subversion, opposition and destruction of the government of the United States and of the State of Louisiana by violence or other unlawful means, for this, to-wit: (1) that said Troy Bland Cade has taught and advocated, and is teaching and advocating, that the Negro under our system of government ‘gets nothing but slavery, hell and death’ and that a separate and new nation and government must be established by the Negro people and that this nation and government shall be within the United States, and that this Negro nation is entitled to the State of Louisiana and other southern states because ‘we feel that 310 years of slave labor that our parents have undergone in America should be enough pay’, and that the owners of such land today have no rights or interest, and that such new nation and government must be established whether by violence or any other unlawful means within the boundary of the United States, and that such teaching is being done to adults and children; (2) that said Troy Bland Cade is a member of an organization or society which advocates and teaches these things as set forth herein, such organization being known as Muslims or Islam and is a leader and teacher of such destruction and opposition to the United States and of the the State of Louisiana sfc >}: »
In this Court, the defendant has filed a motion challenging the jurisdiction of the state courts. He contends that the state courts are without jurisdiction in cases involving subversive activities since the federal government has preempted this field 'by the enactment of the Smith Act.[1]
*541 In essence, defendant contends that criminal anarchy, as proscribed by LSA-R.S. 14:115, is a crime against the nation, that the state statute is unenforceable, and that the state courts are without jurisdiction to punish this crime. Defendant relies upon Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640, and State v. Jenkins, 236 La. 300, 107 So.2d 648.
In Commonwealth of Pennsylvania v. Nelson, supra, the United States Supreme Court resolved that federal legislation had preempted the field of subversive activity, thus rendering state legislation on the subject matter inoperative. Following that decision, this Court held in State v. Jenkins, supra, that any claim of reserved state power in prosecutions for communist activity had been foreclosed by the Nelson decision. However, this Court further stated that “If a case of sedition is ever presented under our law which does not necessarily involve seditious acts against the Federal government, it will be time enough to decide whether the ruling in Commonwealth v. Nelson precludes such a prosecution.”
The Supreme Court of the United States has now clarified its holding in the Nelson case by the following pronouncement in Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090:
“In Nelson itself we said that the 'precise holding of the court * * * is that the Smith Act * * * which prohibits the knowing advocacy of the overthrow of the Government of the United States by force and violence, supersedes the enforceability of the Pennsylvania Sedition Act which proscribed the same conduct.’ (Italics supplied.) 350 U.S., at 499, 76 S.Ct. at 478, 100 L.Ed. 640. The basis of Nelson thus rejects the notion that it *543 stripped the States of the right to protect themselves. All the opinion proscribed was a race between federal and state prosecutors to the courthouse door. The opinion made clear that a State could proceed with prosecutions for sedition against the State itself; that it can ligitimately investigate in this area follows a fortiori. In Sweezy v. New Hampshire [354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311], supra, where the same contention was made as to the identical state Act, it was denied sub silentio. Nor did our opinion in Nelson hold that the Smith Act had proscribed state activity in protection of itself either from actual or threatened .‘sabotage or attempted violence of all kinds.’ In footnote 8 of the opinion it ,is pointed out that the State had full power to deal with internal civil disturbances. Thus registration statutes, quo zvarranto proceedings as to subversive corporations, the subversive instigation of riots and a host of other subjects directly affecting state security furnish grist for the State’s legislative mill.”
The plain import of this judicial pronouncement is that state statutes proscribing criminal anarchy have been superseded by .federal legislation only insofar as they specifically punish sedition against the United States Government. The sovereign states have not been stripped of their means of self-defense.
The instant prosecution is clearly one in which the state seeks to protect its own governmental integrity. Hence, the plea to the jurisdiction is without merit.
Pretermitting earlier Bills of Exception, we must pass to a consideration of Bill of Exception No. 13, for it has given us grave concern. This Bill was reserved to the overruling by the trial court of defendant’s motion for a new trial. Among other things, the motion for a new trial alleged that no evidence had been adduced to establish that the defendant taught or advocated opposition to the established government by violence or other unlawful means, or that the defendant belonged to an organization which he knew advocated such a doctrine. The transcript of evidence was made a part of and attached to the Bill of Exception. Hence, the Bill raises a question of law of which this Court has cognizance.[2]
The purpose of the statute proscribing criminal anarchy is to prohibit the advocacy or teaching of any doctrine that contemplates violence, crime or other unlawful means of effecting governmental *545 change. It is true that the defendant has attacked[3] the constitutionality of the statute on the ground that it is an unwarranted impairment of the freedom of speech and the press protected by the federal and state constitutions. The defendant also contends that the statute is unconstitutionally vague.[4] However, we find no merit in this attack. Freedom of speech and press has at no time been considered an unrestricted license. It is subject to reasonable legislative regulation. As we view it, the statute in the instant case imposes only a reasonable limitation upon this basic freedom. It is a reasonable and constitutional exercise by the state of its police power.[5] Moreover, it defines the crime with sufficient precision to give a person of ordinary intelligence fair notice as to what conduct is criminal. Hence, it is not unconstitutionally vague or indefinite.[6]
An examination of the statute and the indictment discloses that an essential element of the crime charged is the defendant’s advocacy of violence or other unlawful means in opposition to or destruction of the established government, or the defendant’s belonging to an organization which he knows advocates such a doctrine. It is not a crime to advocate governmental change through orderly, democratic processes, which our form of government provides. Neither is it a crime to persuade or exhort others in an effort to enlist public support for such a change. In the battle of ideas is found the genius of our form of government. The litmus test of the crime charged is whether violence, terrorism, or other unlawful methods have been advocated.
In the instant case, the evidence adduced by the prosecution to establish the doctrinal teachings of the defendant and his organization consists of the testimony of James Calvin Gaines, a 13 year-old member of the cult, a recording of the testimony of the defendant given before the Grand Jury, and a blackboard on which is inscribed the flags and symbols used by the sect for instruction.
The blackboard was admitted in evidence over defense objection.[7] It was also the subject of a defense motion to suppress. Bi'iefly, the defense contends that the board was taken from the Muslim Temple without a search warrant. Hence,

*547

the defense asserts, it was obtained by an illegal search and seizure and is inadmissible in evidence. The defense relies upon Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The record reflects that the Chief of Police, who was investigating *549 the sect for subversive activities, had gone to the temple in response to an invitation to the public to attend a meeting. While there, he and his officers were attacked by the defendant and other Muslims. During the course of making arrests for battery, the Chief of Police took possession of the blackboard, which was on display in the building. The evidence of record does not establish that the blackboard is the property of the defendant. Under these circumstances, we cannot perceive how the action of the Chief of Police constitutes a search and seizure as to the defendant. Moreover, it is clear that if the action constituted such a search and seizure, it was a reasonable one incident to a lawful arrest.[8] We conclude, then, that the blackboard was properly admitted in evidence. We shall consider the board later.
Insofar as the record shows, Islam is a religion. It has been practiced in the United States for 32 years. Temples, or mosques, have been established in a number of cities. The sect worships one god, called Allah, and believes that Elijah Muhammad, leader of the sect, is his messenger. The faith and practice of the sect embrace an afterlife, prayer, charity, and fasting. Physical fitness is encouraged.
The sect is opposed to integration of the races. In fact, it advocates a complete racial separation. To accomplish this purpose, it seeks land from the United States government for the settlement of negroes. No evidence was presented, however, that it seeks to accomplish this purpose by force, violence, or other unlawful means.
The blackboard, to which reference has been made, was displayed in the Muslim Temple. As one faces the board, a flag of the United States appears on the left side. Underneath the flag is the inscription, “Christianity”, and a cross. Immediately under the cross are the words, “Slavery Hell Death”. To the right of these words is a tree from which a black person is suspended by a rope over a fire. On the right of the board is depicted the flag of Islam. Under it is the inscription, “Freedom Justice Equality”. In the center of the board is the question: “Which one will survive the war of Armage¿on?”
The state called James Calvin Gaines, a 13 year-old member of the sect, to explain the blackboard and sectarian doctrines. This witness had been a member for two years. He testified that the defendant, Cade, had explained the blackboard to him.
As explained by him, the inscription, “Slavery Hell Death,” referred not to the future but to the past. It was a sectarian interpretation of the racial history of the negro under Christianity, particularly during the slave era. The war (or battle) of *551 Armagedon referred to the final conflict between the forces of good and evil. The question posed concerning Armagedon meant “Which religion will survive.” We , . , _ , . note that an account of this final conflict is , , also recorded m the sacred tomes of the Christian religion.[9] Needless to say, it has no reference to civil strife, unless it is employed in a special, or extraordinary, sense.
Gaines had never heard the flag of Islam, which he described as a religious flag, compared to the flag of the United States. The state propounded to him the question of whether he had rather live under the flag of the United States or that of Islam. This question was objected to as irrelevant and inadmissible since it required the child to make a choice between the flag of his religion and that of his civil government, two incomparables. The objection was overruled. ' We will also consider this testimony. In response to the question, he testified that he would rather live under the flag of Islam. However, he further stated that this preference was not based on the teachings of .the defendant, but rather on his own “opinion”:
“Q. Go ahead James.
“A. I would rather live under the flag of .Islam.
“Q. That is based on what Troy Cade has taught you of the meanings of this board in connection with his teachings concerning this Nation of Islam, is that correct?
«A. N0) sirj that is my opinion »
The state’s witness, Gaines, further testified:
“Q. Now James, did you while you attended the meetings either in the temple or elsewhere where you had any meetings, if you had any, in any private homes or any private places or public places, have you ever heard Cade, the defendant over here, ever advocate the overthrow of the State of Louisiana or the Government of Louisiana ?
“A. No, sir.
“Q. Or take any of the land belonging to the State of Louisiana?
“A. No, sir.
“Q. Have you ever heard him teach or advocate the overthrow of the United States Government?
“A. No, sir.
“Q. At the temple or elsewhere have you ever heard him teach anything concerning that?
“A. No, sir.
“Q. Have you ever heard any other teacher or minister attend your temple or church and ever teach *553 the overthrow or taking land belonging to the State of Louisiana ?
“A. No, sir.
“Q. Or overthrowing any part of the Government of the State of Louisiana?
“A. No, sir.
******
“Q. Now I see the word ‘Islam’ and some more words down below it there, what did he tell you about Islam ’
“A. Islam in the dictionary, it means peace.
“Q. It means peace?
“A. Yes, sir, and Islam is a peaceful religion and in this religion all the members receive freedom, justice and equality.
“Q. In that religious faith?
“A. Yes, sir.
******
“Q. Did you ever hear him say that he wanted or his faith or religious faith, people that you belong to— this faith there, wanted to create a new government in this country and control this country by the negro race?
“A. No, sir.
******
'‘Q. Your understanding of the flag of Islam, is that a religious flag or is that a flag of a country or a religious organization? I heard you say something about the flag or country or Nation of Islam. What do you mean by that?
“A. I think that this flag represents a religion.
“Q. Religion. What religion does it represent?
“A. It represents the religion of Islam.
“Q. The religion of Islam.
“A. Yes, sir.
“Q. Have you ever been taught by Cade or anyone in any of these meetings, either in your temple or elsewhere, that that flag of Islam was superior to the United States flag? Should rule over the United States flag?
“A. No, sir, I have never heard the religion of Islam flag compared with the United States flag.
“Q. You never have heard them compared? You never heard them compared ?
“A. No, sir.”
The recording of the testimony of the defendant before the Grand Jury, introduced by the state, contains no admission of the advocacy of force, violence, or any unlawful means of accomplishing the ¡purposes *555 of the society. The defendant’s disavowal of unlawful methods is clear and positive: “We have no intention in no way whatsoever of going against any of the laws of the United States of America.”
The defense produced Jeremiah Pugh, another minister of the sect, as a witness to the doctrinal teachings. His testimony corroborates the testimony offered by the state that no force or violence has been advocated by the sect. He testified as follows :
“Q. Now since you have been a minister or attending these services in these temples as you call them have you ever heard your leader or anyone else advocate the taking of land or overthrowing the United States government or any State government ?
“A. No, sir. I have never heard any . minister, I have never heard my leader, the Honorable Elijah Mohammand, or any of his followers teach or advocate the taking of any property in North America by force or ai.y other means. We do not believe in taking anything that doesn’t rightfully belong to us.
* * * * * *
“Q. But has he ever advocated or you ever advocated or heard any other leader ever advocate taking by force or any means unlawfully land or property belonging to any State or any government?
“A. No, sir. Our leader has never advocated that, in fact he couldn’t advocate that. This is contrary to the religion that he teaches and furthermore we have nothing with which to take any land from anyone. We are forbidden to carry arms on our person, to have them in our temples or even in our homes. No Muslim carries arms, so I don’t know how this could even be thought of, that we would seek to take something by force of arms. We don’t have the means to do such a thing and we don’t advocate it any how.”
Inasmuch as the state called James Calvin Gaines as a witness, it vouched for his credibility. The state did not attempt to impeach him. Neither was any contradictory testimony adduced.[10] Hence, the explanatory testimony of this witness became identified with the blackboard just as strongly as if the explanation appeared in an official, sectarian manual introduced in evidence by the state. When the blackboard is considered with this testimony, as must be done, any notion of the advocacy of the subversion of government by violence or *557 other unlawful means is effectively and fully negated by the state’s own evidence. In our opinion, no incriminatory inference can be drawn from the board.[11]
The state has made no specific contention that the aggressive conduct of the Muslims against the police officers who entered the Temple constitutes evidence of the defendant’s guilt of the offense of criminal anarchy. However, we have carefully considered this evidence. The activity was directed against the individual police officers, ostensibly because their entry into the Temple violated segregation of the races, a tenet in which the sect strongly believes. In our opinion, it is in no sense probative of the advocacy of violence or other unlawful means to accomplish governmental change. Such an extension of this evidence would bring within the scope of the criminal anarchy-felony statute every tavern brawler who scuffles with the police, a consequence that cannot be seriously supported.
We have searched the record in vain for any evidence that the defendant advocated opposition to or destruction of the established government by force, violence, or other unlawful means. Neither have we found any evidence in the record that the organization, of which the defendant is a member, has espoused such a doctrine.
The state asserts, however, that the teachings of this sect foster racial hatred. That the doctrinal content may arouse racial prejudice cannot be gainsaid. However, teachings of this nature are not denounced as a crime by the instant statute. The danger sought to be averted is the overthrow of organized government by violence or other unlawful means.
The free exercise of religion, whether it be in the Judeo-Christian tradition or not, has been wisely accorded constitutional protection under our system of government.[12] Religious freedom is deeply in grained in our social, religious, and governmental institutions. As fundamental as religious freedom may be, however, it creates no immunity for crime committed under the guise of religious dogma. The advocacy of any doctrine, although denominated religious, which contemplates the overthrow of established government by violence or terrorism falls under the proscription of law.
Having found no evidence in the record to establish that violence or other unlawful means have been advocated by the defendant or his organization, we conclude that an error of law has been committed. We find it unnecessary to consider the remaining Bills of Exception. Clearly, this error is prejudicial to the substantial rights of the *559 defendant. Hence, the conviction and sentence must fall.
We do not hold, however, that the defendant, Troy Bland Cade, or the Muslim organization has not in fact advocated subversion of the government by violence or other unlawful means. We hold only that the record before us, by which we are bound, contains no evidence to establish this indispensable foundation of guilt.
The defendant filed in the trial court a motion for a directed verdict. The court very properly’ rejected it on the ground that such a motion is authorized only in' misdemeanor cases triable by the court alone.[13] For the same reason, we cannot consider it here. The case will be remanded for a new trial.[14]
For the reasons assigned, the conviction and sentence are reversed and set aside, and the case is remanded for a new trial.
HAMLIN, J., concurs in part and dissents in part.
SUMMERS, J., dissents.

. 18 U.S.C.A. § 2385:
“Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof, or the government of *541 auy political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or
“Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any 'government in the United States by force or violence, or attempts to do so; or
“Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—
“Shall be fined not more than $20,000 or imprisoned not more than twenty years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.
“If two or more persons conspire to commit any offense named in this section, each shall be fined not more than $20,000 or imprisoned not more than twenty years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.”

. State v. Gatlin, 241 La. 321, 129 So.2d 4; State v. Roberts et al., 224 La. 491, 70 So.2d 100; State v. McLean, 216 La. 670, 44 So.2d 698; State v. Wooderson, 213 La. 40, 34 So.2d 369.

. Bill of Exception No. 1, reserved to the overruling by the trial court of a motion to quash the indictment.

. Article I, Section 10, LSA-Constitution.

. See Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095; Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138.

. See State v. Roth, 226 La. 1, 74 So.2d 392; State v. Saibold, 213 La. 415, 34 So.2d 909; and Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095.

. Bills of Exceptions Nos. 2 and 7.

. LSA-R.S. 15:60; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L. Ed. 653; Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

. See Webster’s Third New International Dictionary, Verbo Armageddon.

. LSA-R.S. 15:487-15:489; 1 Underhill’s Criminal Evidence (5th Ed.), § 231, pp. 535-539.

. Compare Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108.

. U.S.C.A. Constitution of the United States, Amendment 1; Article I, Section 4, LSA-Constitution of Louisiana.

. LSA-R.S. 15:402.1.

. See State v. Gatlin, 241 La. 321, 129 So.2d 4; State v. McLean, 216 La. 670, 44 So.2d 698; State v. Wooderson, 213 La. 40, 34 So.2d 369; State v. Wilson, 196 La. 156, 198 So. 889.