278 So.2d 485 (1973)
STATE of Louisiana
v.
Emmitt J. DOUGLAS.
No. 52865.
Supreme Court of Louisiana.
May 7, 1973.
*486 Murphy W. Bell, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., LeRoy A. Hartley, Sp. Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Ralph L. Roy, Baton Rouge, for plaintiff-appellee.
BARHAM, Justice.
The defendant Emmitt J. Douglas was convicted after a trial by jury of inciting a riot, a violation of R.S. 14:329.2, and was sentenced on June 11, 1971, to pay a fine of $350.00 (or serve a 30-day sentence in default thereof) and to serve a sentence of three months in the East Baton Rouge Parish jail. The three-month jail sentence was suspended on good behavior for one year. The basis of the prosecution was a speech made by the defendant at a rally.
At the outset it is necessary for us to meet defendant's argument that the statute under which he was prosecuted is unconstitutional. The applicable sections of Title 14 of our Revised Statutes are as follows:
"§ 329.1 Riot
"A. A riot is a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property."
"§ 329.2 Inciting to riot
"Inciting to riot is the endeavor by any person to incite or procure any other person to create or participate in a riot."
While permissible infringements upon First Amendment privileges are very limited, that provision of the United States Constitution does not deprive the states of the power and authority to regulate conduct which is "more than `speech', more than `press', more than `assembly', and more than `petition'. * * * Narrowly drawn statutes regulating the conduct of demonstrators and picketers are not impossible *487 to draft." Justice Black concurring in Gregory v. Chicago, 394 U.S. 111, 89 S. Ct. 946, 22 L.Ed.2d 134 (1969). Justice Black continued: "* * * But to say that the First Amendment grants those broad rights free from any exercise of governmental power to regulate conduct, as distinguished from speech, press, assembly, or petition, would subject all the people of the Nation to the uncontrollable whim and arrogance of speakers, and writers, and protesters, and grievance bearers." (Emphasis here and elsewhere supplied.) See also Cox v. Louisiana, 379 U.S. 536, 85 S. Ct. 453, 13 L.Ed.2d 471 (1965).
If the statute before us did not on its face readily lend itself to a construction and interpretation which would not infringe upon First Amendment rights, we would be compelled to declare it unconstitutional. Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). However, the statute appears on its face to regulate conduct which is not within the ambit of the First Amendment protection. A riot is "tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct", which results in injury or damage or creates a clear and present danger of injury or damage. Inciting to riot, with which this defendant was charged, is "the endeavor by any person to incite or procure any other person to create or participate in a riot". Clearly these provisions (along with the penal provision, R.S. 14:329.7) make punishable both the conduct of one who engages in violence in combination with others and the conduct of one who intentionally and willfully endeavors to incite or procure any other person to create or participate in violence with others i. e., to endeavor to incite a "riot" as defined by R.S. 14:329.1.
Since no one would seriously contend that actual participation in a riot is protected by the First Amendment, it would seem that actions or endeavors or conduct to procure or incite others to riot is no less outside the protection of the First Amendment. For speech to constitute this conduct of inciting to riot, it must be a willful, intentional "endeavor" to gain as an immediate result, and specifically from that speech, the participation of three or more persons in combination to do violence. Under this construction of the statute[1] we proceed to discuss the merits of defendant's Bill of Exceptions No. 5, pretermitting consideration of the other bills urged.
On July 31, 1969, the defendant, then the NAACP state president, participated in a protest march and rally sponsored by the Baton Rouge branch of the NAACP. Dr. D'Orsay Bryant, president of the sponsoring body, was in charge of the affair. The purpose of the march and rally was to demonstrate the black community's concern over allegedly brutal police conduct which resulted in the shooting deaths of two black youths within a few weeks before the date of the rally.
At the rally, which took place on the steps of the city hall, the defendant delivered the speech which formed the basis of his prosecution for inciting to riot.[2] Within *488 *489 an hour after the disbanding of the marchers a rash of seemingly unprovoked assaults and batteries began to occur in various parts of the city. Later that evening there were a number of fires at various locations throughout the city, some of which resulted from the hurling of firebombs and some of which were of unknown origin. The prosecution contended at the trial that all of these incidents resulted from the defendant's speech to the rally crowd.
The defendant was the last of three speakers to address the assemblage and spoke immediately after a black youth named Jerry Johnson, who had not been scheduled on the program but spoke at the request of D'Orsay Bryant. Johnson's speech contained numerous inflammatory remarks. The prosecutor in his opening remarks at the trial presented to the jury his theory that the defendant had "adopted" the volatile speech made by Johnson, and quoted to the jury inflammatory remarks made by Johnson during the course of his speech. The prosecutor then quoted a few selected phrases from Douglas' speech in which the defendant stated that the black community was no longer going to turn the other cheek but was now going to take an eye for an eye and in which he stated to the crowd, at the conclusion of his speech, "Do your thing".
After a four-day trial, during which the prosecution presented evidence of numerous incidents of violence which occurred on July 31, 1969, after the rally, and introduced into evidence the speeches of the defendant and Jerry Johnson, the jury returned a responsive verdict of guilty of inciting a riot.[3] At the close of the State's evidence, and before the defense presented its witnesses, the defense orally moved for a directed verdict, alleging that the State had failed to prove essential elements of the crime of inciting to riot as charged, to-wit: damages in excess of $5000.00 (see R.S. 14:329.7(B)), and the element of willfulness. The trial court denied the motion, stating that it did not have the authority to grant a directed verdict in light of recent decisions of this court. The defense reserved Bill of Exceptions No. 5 to the court's ruling.
There can be no doubt that the decisions upon which the trial court relied in its denial of the defendant's motion for a directed verdict were State v. Hudson, 253 La. 992, 221 So.2d 484 (1969), and its progeny.[4] In Hudson, as in this case, the *490 defendant Hudson moved for a directed verdict, alleging that there was "no evidence". However, the trial judge found specifically that the State had made out a prima facie case. It has long been the opinion of some members of this court that the declaration in Hudson of the unconstitutionality of Code of Criminal Procedure Article 778 (providing for directed verdicts) was mere dictum. In dissent in Hudson, Justice Barham pointed out that the bill of exceptions taken to the trial court's refusal to direct a verdict posed a question of the jurisdiction of the trial court, not of the Supreme Court, and that the Supreme Court therefore could not note the unconstitutionality of the statute ex proprio motu. Justices Hamiter and Sanders, though they concurred in the denial of a rehearing in Hudson, were of the opinion that consideration of the consititutional question concerning the directed verdict statute was "unnecessary and improper". In his concurring opinion in State v. Williams, 258 La. 801, 248 So.2d 295 (1971), in which Justices Barham and Dixon concurred, Justice Tate agreed that the issue had not been properly before the court in Hudson.
It would therefore be unnecessary to overrule Hudson, considering that the determination of unconstitutionality is merely dictum. Four members of the present court have expressed the view that the issue of constitutionality was not properly before the court when it decided Hudson. Nevertheless, we now consider the basis for that declaration of unconstitutionality in Hudson, which was that statute's conflict with Article XIX, Section 9, of the Louisiana Constitution of 1921. Section 9 provides: "* * * The jury in all criminal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge." The Hudson majority determined that because Article 778 allowed the trial judge to direct a verdict of acquittal if the evidence was insufficient to sustain a conviction, it clashed with the constitutional mandate that the jury decides the question of guilt or innocence. However, Article XIX, Section 9, of our Constitution requires that the jury be the judge of the law and the facts on the question of guilt or innocense after having been charged as to the applicable law by the presiding judge. See Justice Tate's concurring opinion in State v. Williams, supra. Until the judge charges the jury as to the applicable law in the case, the judge, not the jury, is the trier of the law.
In the federal system, sufficiency of the evidence is a question of law, and the federal trial judge may take a case away from the jury where there is an insufficiency of evidence to sustain a conviction. In Ex parte United States, 101 F.2d 870 (7th Cir. 1939), the United States Court of Appeals for the Seventh Circuit stated that: "* * * The essence of legal power is to take the case away from the jury, where there is an insufficiency of evidence to sustain a conviction. The power to direct a verdict and the power to render a judgment of dismissal pursuant to the reservation of the legal question are clearly incidental to, and necessarily flow from, the judicial function of determining the legal sufficiency of the evidence. The court has inherent power to invoke these procedural aids in its effort to administer criminal justice. * * *"
In Louisiana we have said that insufficiency of the evidence is not a question of law and may not be reviewed by this court.[5] However, this court has repeatedly *491 held that a total lack of evidence (that is, no evidence) is a question of law and may be considered by us, provided that a bill of exceptions properly perfected presents all the evidence so that we may determine whether there is a total lack of evidence to prove a crime or an essential element thereof. We hold that the language in Article 778 "* * * if the evidence is insufficient to sustain a conviction" refers to a situation in which the prosecution has produced no evidence to prove a crime or an essential element.
Assuming that the Hudson decision and subsequent cases following that decision do render Article 778 unconstitutional, we now reinstate Article 778 by overruling Hudson to the extent that it invalidates the directed verdict article.[6]
In the case sub judice the defendant attached all of the State's evidence to his bill of exceptions reserved to the denial of his motion for a directed verdict. The defendant contends that there is no evidence to prove that he willfully incited to riot, and we agree that there is no evidence. At no time during the trial did the prosecution present any evidence which connected the incidents of violence with the defendant's speech; nor did the evidence presented show that any of the persons responsible for the acts of violence had heard or were motivated by the defendant's speech. No evidence was introduced which even tended to show that the defendant willfully endeavored to incite or procure a riot.
The State's first witness, D'Orsay Bryant, president of the Baton Rouge NAACP, testified to the peaceful, non-violent nature of the march and rally, to the non-violent attitudes and character of the defendant, and to their joint endeavors to keep the rally orderly and non-violent. He further testified that the defendant did not know Jerry Johnson, had no knowledge he would appear on the program, and did not pay much attention to Johnson's speech but was occupied during Johnson's speech in conversation with Bryant and in helping to keep order and marshal some of the young in the crowd. The State's second and third witnesses, Herbert C. Garrison and Alvin Saizan, both of the Baton Rouge Police Department, testified that during Johnson's speech, Douglas was busy trying to keep people from walking in the flower beds which adorn the city hall property. In combination with the strong evidence adduced by the State that Douglas was a non-violent man with a character which ordinarily would not lend itself to this activity, it was clearly shown through the testimony of these three State's witnesses that Douglas did not adopt anything said by the preceding speaker, Johnson.
Moreover, Douglas' speech itself, in full context, is simply an appeal to the black people to seek fully, within the law and in a non-violent and non-aggressive manner, reform in city government. The State admitted in argument that the defendant's speech could not constitute an "endeavor" to incite to riot. Absolutely no evidence was introduced which would even tend to prove that the defendant willfully endeavored to incite or procure a riot. We do not believe that, by any stretch of the imagination, the defendant's speech could be construed to be anything but a reasonable expression of his grave convictions about and deep involvement in what he believed to be racial injustice in the administration of police affairs. We agree with the prosecution's statement in oral argument that the defendant's references *492 could not reasonably be construed, alone or in the context of his whole speech, as an exhortation to violence.
The defendant began his remarks by commending his audience for their good conduct and restraint. During the course of his speech, he expressed repeatedly his belief in non-violent behavior, stating that "Violence begets violence". He further expressed his belief in lawful self-defense and a policy of non-aggression. Later he made the remarks about an eye for an eye and the closing statement, "Do your thing". We find these phrases no more than catch-words which do not per se have a sinister connotation.
The State relied entirely upon the theory that the defendant had adopted Johnson's speech. The State failed to establish any connection between Johnson's remarks and the totally acceptable address by Douglas. Rather, Douglas' speech itself negates the philosophy expressed by Johnson. The State is bound by the testimony of its own witnesses (see State v. Cade, 244 La. 534, 153 So.2d 382 (1963), whose testimony served only to refute any suggestion that the defendant Douglas willfully endeavored to incite to riot directly or by "adoption" of the inflammatory speech delivered by Johnson. Moreover, the State admits, as the record reflects in the presentation of the State's case, that not one of those involved in any violent conduct during the day of the rally was ever placed at the scene of the rally where Douglas made his speech.
We conclude that the State has failed to establish that the crime of inciting to riot had been committed by this defendant. Since we hold that the State presented no evidence to prove an essential element of the crime charged, the trial judge, as the trier of law, should as a matter of law have granted the defendant's motion for a directed verdict.
On this basis, and on the basis of our overruling of State v. Hudson, supra, to the extent that it declared Article 778 of the Code of Criminal Procedure unconstitutional, we reverse the defendant's conviction and sentence and remand to the trial court for proper judgment of acquittal in compliance with this opinion.
SANDERS, C. J., and SUMMERS, J., dissent and file opinions.
MARCUS, J., dissents.
SANDERS, Chief Justice (dissenting).
The defendant was convicted by a jury of inciting a riot in Baton Rouge. By Constitutional provision, our review of his appeal is limited to questions of law. Art. 7, Sect. 10, Louisiana Constitution.
When there is an allegation in a motion for a new trial, that there is no evidence of an essential element of the crime and the evidence is made part of the bill of exceptions, a question of law is raised that can be considered by the Court. State v. Cade, 244 La. 534, 153 So.2d 382; State v. Gatlin, 241 La. 321, 129 So.2d 4; State v. McLean, 216 La. 670, 44 So.2d 698.
Such a question of law was raised by the present defendant by Bill of Exceptions No. 1, reserved to the overruling of his motion for a new trial. Hence, the question of whether there is any evidence to support guilt is before us as a matter of law.
The majority, in my opinion, erroneously reaches out for the constitutional question relating to the directed verdict. The constitutional question is not before the Court.
The only question that we can review is whether or not there is some evidence to support the jury's verdict.
The record reflects that the defendant stood before his emotionally charged audience, already on the verge of violence, and declared:
"I want to tell you something else. I am one who believes in defense. I don't believe *493 in being the aggressor. I don't believe in violence. Violence begets violence. But I want to tell you this and tell you young people
(inaudible)
"These are some of the words of Malcolm X.
(response from crowd)
"It's criminal to teach a man not to defend himself when he's the constant victim of brutal attack. It's legally lawful to own a shotgun or rifle and I want you to know that we all believe in obeying the law.
(response from crowd)
"I don't want you to come down here afraid, and I want you to be men and women when you walk around here and no longer, no longer are we going to take this old thing about turning the other cheek. We're going to take an eye for an eye.
(response from crowdinaudible)
"Don't do this any more, don't do that no more, I have preached that for about eleven years in this community and now I'm telling youdo your thing.
(response from crowd)"
Within a few minutes of this utterance, violence erupted among the groups leaving the meeting. The violence was directed against various citizens of Baton Rouge who were on the streets at the time.
Just as one cannot shout fire in a crowded theater, one cannot use the emotionfilled words shown here in an atmosphere of violence. When so used, the words are welded into an instrument of force. Such utterances violate the statute.
In my opinion, the jury had some evidence on which to base its verdict. We are prohibited from reviewing the sufficiency of the evidence. Hence, we should affirm the conviction.
For the reasons assigned, I respectfully dissent.
SUMMERS, Justice (dissenting).
The Constitution of Louisiana declares in unmistakeable terms that "The jury in all criminal cases shall be the judges of the law and of the facts on the question of guilt or innocence, having been charged as to the law applicable to the case by the presiding judge." La.Const. art. XIX, § 9. This article plainly states that questions of guilt or innocence can only be decided by the jury. State v. Gatlin, 241 La. 321, 129 So.2d 4 (1961); State v. Broussard, 217 La. 90, 46 So.2d 48 (1950). By the terms of the Constitution, judges must decide only those fact questions which do not relate directly to guilt or innocence. State v. Hayes, 162 La. 917, 111 So. 327 (1927).
And, to enforce the principle so clearly stated in Article XIX, the Constitution further provides in Article VII, Section 10, that the appellate jurisdiction of this Court in criminal cases is limited to "question of law only."
This decision entails a deliberate violation of the Constitution by the new found majority of the court. In doing so, not only is the Constitution violated, but a series of decisions upholding State v. Hudson, 253 La. 992, 221 So.2d 484 (1969), have been overruled. In the Hudson Case the Court declared unconstitutional Article 778 of the Code of Criminal Procedure authorizing the directed verdict in jury cases.
One of the grounds assigned by the majority for overruling the Hudson Case and its progeny is the fact that in the Hudson Case the constitutionality of the directed verdict in jury cases was not at issue. For this reason the majority holds the Hudson Court's declaration that Article 778 was unconstitutional to be mere dicta.
Conceding arguendo the validity of such a contention, this Court on repeated occasions *494 thereafter, when the constitutionality of Article 778 was squarely before it, reaffirmed the proposition that the directed verdict in jury trials was violative of the Constitution. No issue in recent years has been more often before the Court and no question has been more deliberately reaffirmed. In several instances, members of today's majority subscribed to the proposition. In a matter so repeatedly affirmed it is difficult to understand the sudden turnabout. State v. Franklin, 263 La. 344, 268 So.2d 249, 252 (1972); State v. Jones, 263 La. 255, 268 So.2d 216, 217 (1972); State v. Feazel, 263 La. 134, 267 So.2d 548, 549 (1972); State v. Smith, 263 La. 75, 267 So.2d 200, 201 (1972); State v. Higginbotham, 261 La. 983, 998, 261 So.2d 638 (1972); State v. Hall, 261 La. 777, 781, 260 So.2d 913 (1972); State v. Burch, 261 La. 3, 258 So.2d 851 (1972); State v. Dimopoullas, 260 La. 874, 257 So.2d 644 (1971); State v. Graves, 259 La. 526, 542, 250 So. 2d 727 (1971); State v. Bradford, 259 La. 381, 394, 250 So.2d 375 (1971); State v. Arnold, 259 La. 139, 145, 249 So.2d 552 (1971); State v. Millsap, 258 La. 883, 900, 248 So.2d 324 (1971); State v. Williams, 258 La. 801, 805, 248 So.2d 295 (1971); State v. Holmes, 258 La. 221, 232, 245 So. 2d 707 (1971); State v. Braxton, 257 La. 183, 186, 241 So.2d 763 (1970); State v. Douglas, 256 La. 186, 235 So.2d 563 (1970).
Another basis assigned for justifying the Court's action today in taking the determination of guilt or innocence away from the jury, is that Article XIX, Section 9, requires that the jury be the judge of the law and the facts on the question of guilt or innocence after having been charged as to the applicable law by the presiding judge. Thus, it is concluded, until the judge charges the jury as to the applicable law in the case, the judge, not the jury, is the trier of the law. The opinion then continues by saying that in the federal system, sufficiency of the evidence is a question of law and the federal trial judge may take a case away from the jury where there is an insufficiency of evidence to sustain a conviction. Much is said thereafter of judicial "power"; little is said of judicial "authority". Therein, in my opinion, lies the philosophy behind this decision. It is a seizure of power pure and simple, a refusal to act within constitutional restraints and the "authority" granted by law. This Court has no "power"; it has only authority and only that which the Constitution delegates.
Thereafter the opinion resurrects Article 778 from the unconstitutional graveyard where it had reposed for four years. In doing so the majority further compounds the errors it commits by declaring that the language in Article 778, "... if the evidence is insufficient to sustain a conviction," refers to a situation in which the prosecution has produced "no" evidence to prove the crime or an essential element of the crime charged.
How the word "insufficient" evidence can suddenly be made to mean "no" evidence is difficult to justify. Insufficiency has always, until now, been understood to refer to adequacy in amount; the existence of some of the subject referred to being implicit in the definition. And so it has been with our doctrine of review. We have always said in keeping with the constitutional mandate that we would not review the evidence where there was "some" evidence, no matter how little. Only when there is no evidence "at all" have we considered a question of law to be presented which would permit the court on proper motion to overturn the verdict of guilt and remand the case for a new trial. State v. Hochenedel, 253 La. 263, 217 So.2d 392 (1968), cert. denied, 395 U.S. 922, 89 S.Ct. 1769, 23 L.Ed.2d 239; State v. Cade, 244 La. 534, 153 So.2d 382 (1963); State v. Gatlin, 241 La. 321, 129 So.2d 4 (1961); State v. McLean, 216 La. 670, 44 So.2d 698 (1950).
Article 778 purposely adopted the standard of "insufficient" evidence, copying the federal concept of directed verdicts, notwithstanding *495 that the federal constitution did not contain the inhibitions against judges deciding facts contained in the Louisiana Constitution. It was undoubtedly the intention of the drafters of that article to deliberately circumvent the accepted meaning of Article VII, Section 10, of the Constitution against review of facts by the Supreme Court in criminal cases. The spurious argument suggested to accomplish this result was that "it could be argued that the appellate review of the lower court's ruling involves a matter of law and not of fact." See Official Revision Comment. By this irrational device it was intended to take from the jury the determination of guilt or innocence. The Hudson Case struck this attempt down as repugnant to the Constitution. Today marks a return to life of that unconstitutional statute denying the jury the right to determine guilt or innocence, investing instead that right in this Court in the final analysis.
In my view this case illustrates why the basic drive in the constitutional design was to repose the question of guilt or innocence in the common sense judgment of the jury and not in judges. No jury would have the intellectual audacity to hold that "insufficient" evidence meant "no" evidence. Nor would a jury hold, as this Court has, that there was no evidence "at all" touching upon the question of guilt or innocence under the facts and circumstances of this case.
The record is replete with evidence of burned and looted buildings, of battered and assaulted citizens, all following in the wake of appellants' urgings to the already emotion charged crowd in a highly volatile situation to "raise hell", charging "something wrong with this system", appealing to social prejudice, saying there were two courts and two sets of police "one for black and one for white." Building up to a higher pitch appellant said to the predominantly black crowd, "We want to hurt this community just like we been hurt." Provoking the crowd's hostility, he proclaimed: "We're going to take an eye for an eye""do your thing."
This followed the diatribe of Jerry Johnson, who spoke of the death of the youngsters killed by the policemen. He said the colored people in Baton Rouge were tired of this sort of thing. He said that what they needed was more men like Rap Brown and Emmitt Douglas, the appellant. He told the crowd, "We are going to shoot" talking about white honkie cops"We are going to shoot one, two, three or four until this black community is left alone." Then he said, "It is a hot night, but it is going to get hotter tonight," adding, "We are going to bomb, march, fight, prowl, we are going to burn this Capitol," and then he ended up exhorting, "I don't know what you are going to do, but I am going to fill my coke bottle with gas."
The funeral of one of the young Negroes had been that afternoon. The crowd interrupted the speakers frequently with loud, noisy, uncontrolled outbursts.
Within a few minutes after Douglas' speech people on the streets, young and old, men and women, were indiscriminately jumped upon, stomped, beaten, whipped and stoned. All of the victims were white and all of the assailants were young blacks. The riot did in fact occur and it was incited by Johnson and Douglas.
There was evidencea great deal of evidence.
It has been said that the guarantee of trial by jury is for the protection of the accused alone and the State has no interest in jury trials. Not only is this incorrect as the quoted constitutional provisions make clear, but this case demonstrates the State's need for protection from judges, just as the accused does. To assure this protection, in capital crimes the Legislature demands a jury trial, refusing to permit the accused to waive that requirement. But where is the protection from judges who refuse to exercise basic judicial restraint, who refuse to abide by the Constitution, *496 who do not respect the solemn enactments of the Legislature or the long line of cases decided by this very Court? The question needs attention.
I respectfully dissent.
NOTES
[1] See also Douglas v. Pitcher, 319 F.Supp. 706 (E.D.La.1970).
[2] The following is a complete transcription of Emmitt J. Douglas' speech given on July 31, 1969, at the rally:

"SPEAKER: The speaker will now hear from Mr. Emmitt Douglas.
(inaudibleresponse from crowd)
"MR. DOUGLAS: Ladies and gentlemen, today I want to say to you that you have exemplified nothing but good law abiding citizens. I want to commend you for your conduct and your restraint. What I have to say, you all know. I want to talk to the white community a while. These are the people we need to get the message to. I got several letters. These people were saying Wolf Man killed a white cop and we didn't demonstrate. Pork Chop killed a white cop and we didn't demonstrate. And all I ask is that they do the same thing when white cops has killed these black young'uns. If we got justice we wouldn't be up here raising hell. There's something wrong with this system, there's nothing wrong with the laws. The thing that is wrong is the system. We have two courts in this community, one for black and one for white. We have two sets of policemen in this community, one for white and one for black. And after hearing the Mayor last night, I think we have a Mayor for the black folks and one for the white folks.
(response from crowd)
"MR. DOUGLAS: We are here to demonstrate today. We're up here to show a force of strength. We're here to let the white man know that we're no longer going to sit idly by, twiddling our thumbs when they shoot our people down in cold blood.
(response from crowd)
"MR. DOUGLAS: I want to talk today about some things that they respect, some things that they know. I want to recite to the white community a statement that was made by President John Kennedy in 1963. He said this nation was founded by men of many nations and backgrounds. It was founded on the principle that all men are created equal and that the rights of every man are diminished where the rights of one man are threatened. The Negro baby born in America today has about ½ of the chance of completing a high school education as a white baby born in the same time, in the same place; 1/3 as much chance of completing college; 1/3 as much chance of becoming a professional man, 1/3 of a chance of making $10,000.00 a year and even his life is cut a year short. And why? All because of the system of racism. Now we got to do something about this. The white man wants to know what can we do. I want to tell you what you can do. Racism is just like a cancer. When you got a cancer you go to the doctor and you try to cut it out, and the only thing we asking you white people up here today is to cut out your system of racism and treat people on equal terms, on an equal basis, give every man an equal opportunity to do whatever he can do and whatever he may seek.
(response from crowd)
"MR. DOUGLAS: I want to tell you what one of the top officials at the Police told me. You can't legislative love.
(response from crowd)
"MR. DOUGLAS: I don't want Major Bauers to legislative no love, but I sure want him to get the hell rid of any Goddam cop that don't know how to treat people with respect.
(response from crowd)
"MR. DOUGLAS: But he got a man that's a hater. I know you can't legislate love, what is the next thing to do?
(response from crowd)
"MR. DOUGLAS: We got to have some changes in this Police Department and if we don't have, we're going to be down here to kingdom come.
(response from crowd)
"MR. DOUGLAS: I want to talk to you about this Police Department. I have belabored with this administration to do something about this Police Department. It's getting out of hand. It's getting out of hand. And when these Policemen go out here and brutalize black people, they take advantage of white people the same way. I been told about some of the incidents these white cops put on the white people, and to do things, and you can't do one thing to some people and don't expect that same thing to do the same thing to the other people. This Police Department down here is uncontrolled, the Chief say he can't do nothing about it.
(response from crowd)
"MR. DOUGLAS: I don't know what the Chief going to do, I don't know what the Mayor going to do, but I tell you what we're going to do. We're going to raise hell.
(response from crowd)
"MR. DOUGLAS: You know another thing that I want to tell you. We had a black officerwe had a black officer on Acadian Thruway. And this officer stopped to help some of his fellow officers who were white, they told him to get away from here, we don't need no help.
(response from crowdinaudible)
"MR. DOUGLAS: The Sergeant came out and wrote the colored officer up, the Chief suspended him for seven days for not obeying the law. And here we got two black kids shot in the back and these cops still on the payroll.
(response from crowd)
"MR. DOUGLAS: And what I'm going to ask you to do is this. I'm going to ask you to march around this building til the pavement melts.
(response from crowd)
"MR. DOUGLAS: We're going to put so much pressure on this building that the President of the Louisiana National Bank is going to want to know what's wrong. We want to hurt this community just like we been hurt.
(response from crowd)
"MR. DOUGLAS: I want to tell you something else. I am one who believes in defense. I don't believe in being the aggressor. I don't believe in violence. Violence begets violence. But I want to tell you this and tell you young people
(inaudible)
"MR. DOUGLAS: These are some of the words of Malcolm X.
(response from crowd)
"MR. DOUGLAS: It's criminal to teach a man not to defend himself when he's the constant victim of brutal attack. It's legally lawful to own a shotgun or rifle and I want you to know that we all believe in obeying the law.
(response from crowd)
"MR. DOUGLAS: I don't want you to come down here afraid, and I want you to be men and women when you walk around here and no longer, no longer are we going to take this old thing about turning the other cheek. We're going to take an eye for an eye.
(response from crowdinaudible)
"MR. DOUGLAS: Don't do this any more, don't do that no more, I have preached that for about eleven years in this community and now I'm telling you do your thing.
(response from crowd)"
[3] In addition to charging that Douglas incited to riot, the indictment charged that as a result there was damage to property in excess of $5000.00 and serious injury to persons. The second penal provision relating to the crime of inciting to riot, R.S. 14:329.7(B), provides for a harsher penalty when either of these circumstances results.
[4] Some of the cases which followed Hudson are: State v. Douglas, 256 La. 186, 235 So.2d 563 (1970); State v. Braxton, 257 La. 183, 241 So.2d 763 (1970); State v. Holmes, 258 La. 221, 245 So.2d 707 (1971); State v. Williams, 258 La. 801, 248 So.2d 295 (1971); and, quite recently, State v. Franklin, 263 La. 344, 268 So. 2d 249 (1972).
[5] Article VII, Section 10, of the Constitution of Louisiana, in pertinent part, provides: "The appellate jurisdiction of the Supreme Court shall also extend to criminal cases on questions of law alone * * *."
[6] Although we do not believe or acknowledge that Code of Criminal Procedure Article 778 has been declared unconstitutional, we would have no problem in reinstating the article since it obviously does not involve any concern with substantive retroactivity. Therefore the case may be overruled, and if the law were invalidated, it can be reinstated. See West Coast Hotel Company v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), overruling Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923).